[No. S004781. Crim. No. 26415. Mar. 28, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE WAYNE MORRIS, Defendant and Appellant.

154

**COUNSEL**

Robert F. Kane, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Edmund D. McMurray and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—This is an appeal from a judgment of death under the 1978 death penalty law (Pen. Code, § 190.1 et seq.; all further statutory references are to this code unless otherwise indicated). Following a change of venue from Sierra County to San Joaquin County, defendant Bruce Wayne Morris was convicted by a jury of the first degree murder (§ 187) and robbery (§ 211) of Rickey Van Zandt. The jury found as a special circumstance that the murder was committed in the perpetration of a robbery. (§ 190.2, subd.(a)(17)(i).)[1] It fixed the penalty for the homicide at death.

On defendant's automatic appeal from the judgment (§ 1239, subd. (b)), we find no reversible error. We affirm the judgment in its entirety.

### FACTS AND PROCEEDINGS

*Summary*

The body of Rickey Van Zandt was found facedown at the bottom of a hill by Sierra County law enforcement officers. His skull was crushed; he had been beaten to death. Defendant admitted on several occasions before and after his arrest that he had hit Van Zandt over the head at least 13

---

[1] The jury also found that defendant used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b). Following waiver of jury trial, the trial court found that defendant had twice been convicted of a serious felony within the meaning of section 667, subdivision (a) and had served a prior separate prison term within the meaning of section 667.5, subdivision (b).

times with a rock and a stick in order to steal his van. After striking the fatal blows, defendant left the scene in the van with his two female companions and drove out of the state, where he was apprehended. At his trial, defendant repudiated his numerous admissions of guilt and blamed his companions for Van Zandt's murder. The jury rejected his testimony and found him guilty. After it heard penalty phase evidence that focused on defendant's prior offenses of attempted rape and kidnapping, it returned a verdict of death.

### The Prosecution

On September 9, 1985, defendant began hitchhiking from Sacramento toward the north shore of Lake Tahoe. He was accompanied by his girlfriend, Avette Barrett, and her sister, Allison Eckstrom. The three were picked up by Rickey Van Zandt in his van on September 11 or 12. They accompanied him to Truckee, where he stopped at a store and went in, leaving his car keys in the ignition. While Van Zandt was in the store, defendant suggested that he and his companions steal the van. Eckstrom pulled out a knife from a pouch behind the passenger seat, and defendant suggested he could "stick" Van Zandt and they could take the van. The women expressed reservations. Defendant then suggested taking Van Zandt to a nearby river and stabbing him there.

When Van Zandt returned to the van, he and defendant discussed going fishing. They drove to a remote area off a dirt road in Sierra County. While the women were cooking dinner, defendant and Van Zandt walked together toward the river to begin fishing. Defendant returned alone and asked Eckstrom for the knife. He told the women that he would get behind Van Zandt while they were fishing and "get him." Barrett replied, "Whatever," and Eckstrom said it was good that she and Barrett would not have to see it. Defendant took the knife and went down to the river. When defendant and Van Zandt returned 20 to 30 minutes later, defendant explained to Eckstrom that he had not been able to stab him because he could not get behind him.

Van Zandt, who had been drinking, continued to do so while having dinner with defendant and the women in the van. After dinner, Van Zandt lay down on a bed in the rear of the van. At defendant's request, the women left. Emerging a few minutes later, defendant announced: "He's out." He put his arm around Barrett and asked Eckstrom for a rock. He rejected her choice of rocks and directed her to pick up another. He took the rock from Eckstrom, told Barrett he loved her, and said he was going to hit Van Zandt on the head.

Defendant reentered the van. Eckstrom and Barrett heard Van Zandt exclaim, "Ouch, that hurts, stop," and then heard smacking sounds ("like someone hitting a melon") and screams. Defendant later told Eckstrom that he had hit Van Zandt on the head 13 times with the rock. Fifteen to twenty minutes later, the women observed Van Zandt's body drop out of the van. Covered with blood, defendant emerged and dragged the body to the front of the van. Van Zandt was still alive. He was moaning; blood and brain fluids oozed from his head.

Defendant dragged Van Zandt's body from the area of the van and rolled it down a slope. He went down to the body and looked through Van Zandt's pockets. He told Barrett that he was searching for a wallet.

Van Zandt continued moaning and holding his head. Eckstrom, who had been asked by defendant to watch the body, called out that it was moving. Defendant replied that he already knew this. He picked up a stick, lifted it over his head, told Van Zandt that he was sorry, and hit him on the back of the head three times. Van Zandt collapsed to the ground. As the three drove away in Van Zandt's van, Eckstrom observed him still lying on the ground, quivering.

Van Zandt's dead body was found by officers on September 17, five or six days after he was left at the bottom of the slope. A post mortem examination established that he died from massive trauma to the skull. His head was stationary when the trauma was inflicted. There were fragments of wood in his brain. His injuries were consistent with the infliction of nine to fourteen blows with a blunt object such as a rock or stick.

After leaving Van Zandt, defendant and the two women drove around the Western and Central United States, eventually entering Nebraska. They used credit cards found in the glove compartment of the van to make purchases. On September 14, they picked up hitchhiker Tom Logan. Eckstrom told Logan that defendant had killed Van Zandt. Defendant asked Logan whether he had noticed the blood and brain tissue in the van and explained that he had killed Van Zandt in order to steal the vehicle. Eckstrom told Logan that they "really rocked and rolled him." Later, at a campground, defendant told Logan that he had been "kind of coerced into killing this man." According to defendant, he merely wanted to knock Van Zandt out, but Barrett wanted to kill him. Logan fled the trio and called the police. The three were arrested the next day. Among the items seized at the time of arrest were defendant's jeans, which were spattered above the knees with blood.

Shortly after he was taken into custody, defendant asked to speak to an officer. He was properly advised of his constitutional rights and agreed to

make a statement. When permitted to talk to Barrett before his interview, he assured her that he would not "let [her] suffer for something [she] didn't do."

In a 1-hour interview with officers, defendant admitted hitting Van Zandt on the head 12 to 14 times with a rock and a stick. He described the rock as the size of a softball. He first stated that he might have talked about killing Van Zandt to acquire the van, but then modified his statement to say that he only wanted to knock him out and tie him up. He stated that Barrett and Eckstrom told him not to do anything to Van Zandt, but that he told them to "take off" while he "finished what [he was] going to do." He said that after the women left, he "knocked the man out and pulled him off to the side of the hill." According to defendant, he hit Van Zandt with the stick when he started to get up, swinging the stick like a baseball bat.

Later, while in custody in California, defendant wrote a letter to Barrett. The letter was postmarked October 7, 1985, and was intercepted by jail authorities the next day. It stated in part: "I've killed once for you, and if I have to I'll do it again!!! And you know that I can, and I don't need a rock to do it either." Defendant also acknowledged in front of two other Sierra County jail inmates that he had "bashed" a man's skull with a rock thirteen times.

*The Defense*

Defendant testified on his own behalf. He denied killing Van Zandt, claiming that he had admitted doing so only to protect Eckstrom and Barrett. Defendant stated that Van Zandt was killed by the two women when he tried to rape Barrett. According to defendant's testimony, Van Zandt had returned to the van while defendant was still fishing. When defendant later returned, he found Eckstrom upset and Barrett crying. Both women had blood on their dresses. Barrett explained that she had killed Van Zandt by hitting him with a rock when he had tried to rape her in the van. Defendant then pulled Van Zandt, still alive, out of the van. Eckstrom hit him with a stick and mumbled that she had killed him.

A serologist called as a defense expert testified that she had found traces of semen on the fly of Van Zandt's underwear; however, she conceded on cross-examination that these traces could have been deposited anytime since the underwear was last laundered, that they could have been deposited by a partial voiding of the bladder upon death, and that they were not necessarily deposited by ejaculation. She found no semen on Van Zandt's jeans.

Several female Nevada County jail inmates also testified to statements made by Barrett implying that defendant was taking responsibility for Van

Zandt's murder out of misplaced love for her. All three conceded, however, that Barrett had made inconsistent statements about the murder. One witness offered her opinion that Barrett was a liar.

At the close of the guilt phase, the jury found defendant guilty of first degree murder and robbery, and further found as a special circumstance that the murder was committed while defendant was engaged in the commission of the robbery.

*The Penalty Phase*

In aggravation, the prosecution introduced defendant's prior felony convictions. Defendant was convicted in 1978 of kidnapping, attempted rape, and assault with intent to commit rape on a 15-year-old girl. He was also convicted in 1980 of stealing a car and kidnapping its driver, a 61-year-old woman. In mitigation, the defense presented evidence of defendant's troubled childhood. He was hyperactive and unable to read until he was 15. He was harshly disciplined by his parents and choked by a teacher. Defendant had once helped people involved in a car accident at some risk to his own safety and had saved his brother's life when he suffered a heart attack. The defense also presented evidence of defendant's artistic ability, his love for animals, and his leadership in the Boy Scouts.

Two experts with experience as prison officials testified that defendant would be a successful life prisoner. They observed that he had developed work skills while in jail (landscaping and sewing) and had learned the deaf alphabet to assist deaf prisoners. However, he had also been involved in a stabbing incident. A psychologist testified that defendant has mild-to-moderate brain dysfunction. In her view, although defendant knew the difference between right and wrong at the time of the offense, he lacked the ability to control his conduct because the brain dysfunction rendered him unable to understand the long-term consequences of his acts. A psychiatrist testified that defendant has a borderline personality with dependent and antisocial features, and an atypical brain syndrome. He attributed defendant's "antisocial behavior" to his brain condition and psychological disorders.

### JURY SELECTION ISSUES

I. *Discovery of the Prosecutor's Jury Book*

Defendant begins his challenge to the jury selection process by arguing that the trial court erred in refusing to order discovery of the prosecutor's "jury book." Before jury selection began, defendant moved to discover

prosecution records showing the arrest records of venirepersons and how they had voted as jurors in other trials. The prosecutor responded that his office kept evaluation sheets summarizing the prior jury service of each prospective juror, which included a date of trial, charges against the defendant, the verdict, a rating presumably directed to the desirability of the juror from the prosecution standpoint (excellent, satisfactory, or unsatisfactory), and comments. He argued that the evaluation and comments of the deputy district attorney filling out the evaluation sheet were protected work product. The trial court denied the defense motion.

In *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 765-767 [175 Cal.Rptr. 738, 631 P.2d 446], we announced a rule giving trial judges "discretionary authority to permit defense access to jury records and reports of investigations available to the prosecution." (*Id.* at p. 767.) The rule was founded on our power to supervise the administration of criminal procedure and arose from a concern that prosecutors would have more information about prospective jurors than defense lawyers because of their superior ability to finance investigations of the venire. As we stated: "Such a pattern of inequality reflects on the fairness of the criminal process." (*Id.* at pp. 766-767.)

In *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1225 [255 Cal.Rptr. 569, 767 P.2d 1047], we declined to decide whether the defense was improperly precluded from questioning jurors with prior jury experience about the result reached by the prior jury, holding that any error in precluding such questioning was harmless. *Johnson* is applicable here. Even assuming the trial court abused its discretion in failing to order discovery of arrest records and prior jury votes from prosecution records, defendant fails to demonstrate prejudice. *Murtishaw* itself endorses this result in the following observation: "As the prior cases have pointed out, in any individual case it *is* entirely speculative whether denial of access caused any significant harm to the defense. Consequently, under the test of prejudice established in the California Constitution (art. VI, § 13) and *People* v. *Watson* [(1956)] 46 Cal.2d 818, 836 [299 P.2d 243], the denial of access is not reversible error." (*People* v. *Murtishaw, supra*, 29 Cal.3d at p. 767.) Having shown no impairment of his defense resulting from the absence of the prosecutor's jury book at defense counsel table, defendant is not entitled to reversal.[2]

II. *The Trial Court's Remarks to the Jury About the Number of Capital Cases Reversed by the California Supreme Court*

At the beginning of voir dire, the court explained the pending charges and the voir dire procedure, including the need to inquire into each poten-

---

[2]The defense motion sought only jury votes and arrest records. It did not request the opinions or evaluations of individual prosecutors. Because of our disposition of this issue for the reason stated above, we need not consider the effect, if any, of the work product doctrine on the materials prepared and kept as a part of the prosecutor's jury book.

tial juror's attitudes about the death penalty. Its explanation included the following statement: "As far as the process is concerned, let me explain a little about that. You need not, and will not, have to worry about the death penalty in the event that you find, first of all, that there was not a murder or that the murder wasn't in the first degree . . . . You may never get to that point, but we still have to talk to you about how you feel about the death penalty. The supreme court, for the last 56 cases that they have decided about the death penalty, and I'm sure all of you read about the supreme court. There have been 56 cases, ladies and gentlemen, since 1972, I believe, that have talked about death penalty cases. Fifty-three of them were reversed, three of them were affirmed. In those cases, we were given guidelines. I, as a trial judge, was given guidelines as to how we talk to you about this matter. Those guidelines are still in effect. I'm still bound by them and so are you. None of us are above the law. So I have to talk to you about how you feel about the death penalty."

Defense counsel called the trial court's attention to the portion of its statement dealing with the large proportion of appellate reversals in death penalty cases and expressed concern that its remarks might cause some jurors to regard their consideration of the death penalty as an academic exercise. Counsel asked for an admonition to the jury, expressing the view that with the new composition of this court brought about by the judicial retention elections of 1986, "death may mean exactly that." The trial court agreed and gave the following corrective instruction: "Ladies and gentlemen, I have been requested to admonish you a bit about what I said in the beginning concerning the amount of cases heard by the supreme court, 56, I believe I mentioned in number and reversals thereon. The Court, me, personally, did not mean to indicate to you one way or the other how I felt about the matter. The Court only wanted to indicate to you that those 56 cases gave us guidelines, which I am obligated—and I think I told you that, that I'm obligated to follow in cases of this nature. And that's all I intended to do. I did not intend to indicate my favor or disfavor of those decisions. I only indicated it was a threshold, the comment concerning the guidelines, that we have to follow. And now I'm going to tell you about those guidelines."

■ Defendant argues that the trial court's statement minimized the jury's sense of responsibility for returning a death verdict by suggesting that 90 percent of such verdicts would likely be overturned at the appellate level. He relies on *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 341 [86 L.Ed.2d 231, 247, 105 S.Ct. 2633], in which the United States Supreme Court found that a prosecutor's comments regarding the role of appellate courts in reviewing capital cases resulted in a denial of due process. From *Caldwell*,

he reasons that similar remarks by a trial judge are necessarily more egregious.

Viewed in their context in defendant's trial, we find the trial court's remarks irrelevant and improper, but not prejudicial. Initially, we observe that the court's reference to appellate reversals was a brief and isolated one, made at the beginning of voir dire and not during the penalty phase where the death penalty and the jury's sentencing responsibility were the focus of the jury's attention. (See *People* v. *Boyde* (1988) 46 Cal.3d 212, 254 [758 P.2d 25], affd. on other grounds *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 770 [239 Cal.Rptr. 82, 739 P.2d 1250].) It was a small part of a larger statement designed to explain to the jurors an aspect of trial procedure that might engender confusion and frustration, i.e., why they would be individually questioned about the death penalty at the outset, even though the penalty issue might never be reached. As such, the reference was not necessarily critical in the development of the jury's sense of responsibility for its verdict.

Moreover, the trial court's corrective statement, although not specifically directed to the issue of the jury's responsibility for a death verdict, was apparently sufficient to satisfy defendant's trial counsel, who did not request a mistrial or ask for other or further admonitions or remedial steps. Under these circumstances, we are especially reluctant to infer prejudice. (*Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 579, 108 S.Ct. 546, 552].)

Finally, the remainder of the record demonstrates that the trial court imposed and the jury accepted the full burden of responsibility for a death verdict. Both the court's instructions and the arguments of counsel emphasized the awesome character of the jury's responsibility. At the beginning of the penalty phase, the court told the jury that it would have difficult decisions to make. The penalty phase instructions emphasized that the jury must not impose the death penalty if sympathy or compassion based on mitigating circumstances persuaded it to do otherwise. They further admonished that a reasonable doubt as to the appropriate penalty required a verdict of life imprisonment without possibility of parole. With reference to the consequences of a death verdict, the final charge included the caveat: "And you are instructed that a death verdict means exactly what it says. That the defendant will be executed. For you to conclude otherwise would be to rely upon speculation or conjecture and would be a violation of your oath as a juror."

In light of the entire course of instuctions and argument, our observation in *People* v. *Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127],

in which we upheld the verdict despite a similar claim of *Caldwell* error, is apropos here: "The tenor of the argument and the remaining instructions made it clear to the jury that it and it alone was to decide whether defendant should live or die. Although the instruction should not have been given, it was not prejudicial." (*Id.* at p. 634.)[3]

## III. *The Trial Court's Decision to Excuse Prospective Juror Clinton Lee for Cause*

When asked by the court whether he had ever been "arrested" or "in jail for anything," prospective juror Clinton Lee responded in the negative. The prosecutor produced a rap sheet showing Lee's convictions for various misdemeanor offenses including, on two occasions, drunk driving. It also showed two charges of obstructing and resisting an officer (§ 148), one of which was dismissed upon a plea of guilty to drunk driving and another which showed no disposition. The prosecutor moved to excuse Lee, arguing that he had committed perjury. Over objection by defense counsel that "ignorance and stupidity are not grounds for disqualification," the trial court granted the motion.

Defendant claims error, noting that Lee was not specifically asked whether he had been charged with a crime and his answers could have been correct (e.g., he might have surrendered himself as opposed to being arrested and might not have spent time in jail). Observing that Lee had expressed no preconceived views on the death penalty, he further asserts that any error was prejudicial.

The qualification of a juror challenged for cause is a matter within the discretion of the trial court and is seldom a ground for reversal on appeal. (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225]; *People* v. *Sanchez* (1989) 208 Cal.App.3d 721, 732 [256 Cal.Rptr. 446].) There was no abuse of discretion in the trial court's ruling. Whether Lee was taken into custody or surrendered himself, he was nonetheless arrested numerous times. "An arrest is taking a person into custody in a case and in a manner prescribed by law." (§ 834.) "An arrest is made by an actual restraint of the person, *or by submission to the custody of an officer.*" (§ 835, italics added.) In view of Lee's rap sheet, his responses to questions about his arrest record were lacking in candor and completeness. Concealment by a potential juror constitutes implied bias justifying

---

[3] Defendant also complains of the trial court's refusal to sequester the jury. As he acknowledges, he had no right to a sequestered jury. (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1218 [249 Cal.Rptr. 71, 756 P.2d 795].) Even if he had such a right, he shows no prejudice from the failure to sequester the jury in this case. (*People* v. *Morales* (1989) 48 Cal.3d 527, 563 [257 Cal.Rptr. 64, 770 P.2d 244].)

disqualification. (*People* v. *Diaz* (1984) 152 Cal.App.3d 926, 934-936 [200 Cal.Rptr. 77]; see also *Clark* v. *United States* (1932) 289 U.S. 1, 10-11 [77 L.Ed. 993, 997-998, 53 S.Ct. 465].) Lee's disqualification was justified.

Moreover, even apart from whether or not Lee concealed his arrest record on voir dire examination, the trial court had ample cause for disqualification. The prosecutor represented to the court that he had personally prosecuted Lee for some of the charges listed on the rap sheet. The trial court could have reasonably inferred that Lee might harbor ill feelings amounting to bias from these experiences. (See *People* v. *Williams* (1988) 199 Cal.App.3d 469, 476-478 [245 Cal.Rptr. 61]; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 385-387 [136 Cal.Rptr. 45].)

IV. *The Trial Court's Denial of Defendant's Challenges for Cause of Six Prospective Jurors Because of Their Attitudes About the Death Penalty*

■ Defendant assails the trial court's decisions overruling challenges for cause to six prospective jurors who he claims were prejudicially disposed toward the death penalty. We reject his argument for several reasons.

None of the challenged jurors sat on defendant's jury. Defendant excused two of them by peremptory challenge, but used only six of his twenty-two peremptory challenges. ■ In order to complain on appeal about the trial court's decisions overruling his challenges for cause, defendant must show: (1) he used a peremptory challenge to remove the juror in question; (2) he exhausted his peremptory challenges or can justify his failure to do so; and (3) he was dissatisfied with the jury as selected. (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 770-771 [251 Cal.Rptr. 83, 759 P.2d 1260]; *Ross* v. *Oklahoma* (1988) 487 U.S. 81 [101 L.Ed.2d 80, 108 S.Ct. 2273].)

■ Defendant fails the last two essential elements of the test. He did not exhaust his peremptory challenges; he offers no legally sufficient excuse for failing to do so. (See, in contrast, *People* v. *Box* (1984) 152 Cal.App.3d 461, 465-466 [199 Cal.Rptr. 532] [reversing conviction when defendant was allowed only 10 of the 26 peremptory challenges to which he was entitled and explained his failure to exercise the 10th challenge by observing that he could not have removed the 5 or 6 unfavorable jurors with his single remaining challenge and that he risked obtaining a more unfavorable juror from the remaining venire if the challenge were exercised].) Defendant's conduct indicated no dissatisfaction with the jury that heard his case—a jury that included *none* of the persons he unsuccessfully sought to challenge for cause.

Defendant seeks to distinguish the case law, observing that previous decisions did not involve the so-called "struck jury" system of jury selection that was used in this case. (See, e.g., *United States* v. *Ricks* (4th Cir. 1986) 802 F.2d 731, 733.) We described one variation of the struck jury system in our recent opinion in *People* v. *Wright* (1990) 52 Cal.3d 367, 395-398 [276 Cal.Rptr. 731, 802 P.2d 221].

■ Under the standard or "jury box" system of jury selection used in our state, 12 jurors are voir dired, subjected to challenges for cause, and replaced until 12 qualified jurors remain. Both sides then exercise peremptory challenges. A juror removed by peremptory challenge is replaced by another juror who is voir dired and then challenged both for cause and peremptorily. This process continues until peremptory challenges have been exhausted or waived. The 12 remaining persons become the jury.

At defendant's request, a variation of the struck jury system was used in this case instead of the jury box system. Prospective jurors were first individually voir dired and challenged for cause. As a result of this process, a panel of 76 persons was found qualified. A randomly ordered list of the qualified persons was given to both sides showing the order in which these persons would be called to sit as jurors. Starting from the beginning of the list, each side exercised its peremptory challenges until they were exhausted or waived. The first 12 persons remaining on the list became the jury.

Defendant observes that in the jury box system a party exercising a peremptory challenge does not know whether, from his point of view, the next juror will be better or worse. In the struck jury system, the parties know what the entire panel looks like from the individual voir dire examinations. Thus, each party can develop an ongoing sense as to whether the exercise of each peremptory challenge is likely to yield a more or less favorable jury. This difference was undoubtedly the reason defendant requested the struck system.

■ Defendant reasons that he should not be required to exercise all of his peremptory challenges under a struck jury system in order to assign error in refusing challenges for cause. His argument is a non sequitur. The difference between the two systems bears no relationship to the requirement that a defendant exercise peremptory challenges to exclude jurors he believes to be biased against him. Regardless of the system of jury selection, a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors. Having so indicated in this case, defendant cannot reasonably claim error. He is entitled to an impartial jury, not to one of his own choosing. (*People* v. *Bittaker, supra*, 48 Cal.3d 1046,

1087.) He makes no showing that the jury hearing his case was anything but impartial.[4]

■ As we did in *Wright, supra,* we caution trial courts against experimentation with statutory jury selection procedures in capital cases: "[A]dherence to the Legislature's prescribed jury selection procedures remains the proper and authorized way to ensure selection of a fair and impartial jury." (52 Cal.3d at p. 398.)

## V. *The Prosecution's Use of Peremptory Challenges to Excuse Jurors Skeptical About the Propriety of the Death Penalty*

■ Defendant contends the prosecutor used peremptory challenges to excuse seven jurors whom defendant describes as "death penalty skeptics." He argues that the prosecutor's use of challenges for this purpose denied him his right to a neutral and impartial penalty phase jury in violation of the United States and California Constitutions. (U.S. Const., Amends. VI, VIII & XIV; Cal. Const., art. I, §§ 7, 15, 16 & 17.)

Initially, defendant waived any error in this regard by failing to object to the prosecutor's use of challenges. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 331, fn. 29 [261 Cal.Rptr. 348, 777 P.2d 121].) Moreover, we have repeatedly rejected any claim of constitutional infirmity in a prosecutor's use of peremptory challenges to remove jurors with reservations about the death penalty. (*Id.* at pp. 331-332; *People* v. *Dyer* (1988) 45 Cal.3d 26, 58 [246 Cal.Rptr. 209, 753 P.2d 1].) For these reasons, we reject defendant's contention.

## VI. *Cumulative Prejudice in the Jury Selection Phase*

■ Defendant maintains that the cumulative effect of jury selection errors has deprived him of a fair trial. We disagree. As discussed above, there is no merit in any of defendant's jury selection contentions, with the sole exception of the trial court's improper remarks to the jury concerning

---

[4] Were we obligated to consider the merits of defendant's challenges to each of these jurors, it would not change our disposition of his argument. Defendant points to isolated passages in the voir dire examination in which the prospective jurors expressed attitudes concerning imposition of the death penalty. In each case, after further questioning, the prospective juror acknowledged his or her duty to follow the law with respect to the death penalty and his or her ability to bring in a verdict of life imprisonment without possibility of parole if the law and the evidence called for that particular verdict. We defer to the trial court's determination of the states of mind of these jurors in the face of conflicting or equivocal answers to questions concerning impartiality. (*People* v. *Johnson, supra,* 47 Cal.3d 1194, 1224; *People* v. *Coleman, supra,* 46 Cal.3d 749, 763-764, 767 & fn. 10.) There was no error in declining to excuse them for cause.

death penalty reversals. As to those remarks, any error was both cured and harmless. Although a defendant is entitled to a fair trial, he is not entitled to a perfect one. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 156 [249 Cal.Rptr. 320, 756 P.2d 1348], quoting *Schneble* v. *Florida* (1972) 405 U.S. 427, 432 [31 L.Ed.2d 340, 345, 92 S.Ct. 1056].) Because defendant has failed to demonstrate any unfairness or partiality in the process used to select the jury, there is no merit in his argument. (See *Bittaker, supra*, 48 Cal.3d at pp. 1087-1088.)

## THE GUILT PHASE

VII. *The Immunity Agreements for the Testimony of Accomplices Allison Eckstrom and Avette Barrett*

Defendant's girlfriend, Avette Barrett, and her sister, Allison Eckstrom, testified for the prosecution pursuant to written immunity agreements that ultimately spared them from being tried for the murder of Rickey Van Zandt. The agreements provided in part that the prosecutor would dismiss all charges pending against each woman if, among other things: (1) her statements to authorities that she did not personally inflict any injuries on Rickey Van Zandt were true and correct; and (2) she testified completely and truthfully at the preliminary hearing and at trial. The first of these conditions was deleted as to Barrett before trial, but remained in effect as to Eckstrom. Barrett's agreement further required that she take and pass a lie detector test, a condition that was also waived by the prosecutor before trial. Defendant challenges the testimony of the two women, arguing that it was tainted by coercive conditions imposed by the prosecutor.

The Attorney General argues that defendant has waived any error by failing to object when the two women testified. Defendant did, however, make a motion *in limine* to exclude their testimony on the same ground he urges here, i.e., the alleged existence of coercive conditions in their plea bargains. The motion was denied. The Attorney General responds that, notwithstanding the motion, defendant must repeat his objection when the evidence is actually offered to preserve an assignment of error.

A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion." The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the

evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal. (See *Bundy* v. *Sierra Lumber Co.* (1906) 149 Cal. 772, 776 [87 P. 622].)

Evidence Code section 353 does not exalt form over substance. No particular form of objection or motion is required; it is sufficient that the presentation contain a request to exclude specific evidence on the specific legal ground urged on appeal. (Assem. Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 353, p. 245; see also 3 Witkin, Cal. Evidence (3d ed. 1986) § 2018, p. 1979; *People* v. *Gibson* (1976) 56 Cal.App.3d 119, 137 [128 Cal.Rptr. 302].)

Motions *in limine* are a commonly used tool of trial advocacy and management in both criminal and civil cases. Such motions are generally brought at the beginning of trial, although they may also be brought during trial when evidentiary issues are anticipated by the parties. In either event, they are argued by the parties, either orally or in writing or both, and ruled upon by the trial judge. The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party. A typical order *in limine* excludes the challenged evidence and directs counsel, parties, and witnesses not to refer to the excluded matters during trial. (3 Witkin, Cal. Evidence, *supra*, § 2011 at p. 1969.) "The advantage of such motions is to avoid the obviously futile attempt to 'unring the bell' in the event a motion to strike is granted in the proceedings before the jury." (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 337 [145 Cal.Rptr. 47].)

Motions *in limine* serve other purposes as well. They permit more careful consideration of evidentiary issues than would take place in the heat of battle during trial. They minimize side-bar conferences and disruptions during trial, allowing for an uninterrupted flow of evidence. Finally, by resolving potentially critical issues at the outset, they enhance the efficiency of trials and promote settlements. (See Cotchett & Haight, Cal. Courtroom Evidence (3d ed. 1988) p. 28-3.)

Under appropriate circumstances, a motion *in limine* can serve the function of a "motion to exclude" under Evidence Code section 353 by allowing the trial court to rule on a specific objection to particular evidence. In *Sacramento, etc. Drainage Dist. ex rel. State Reclamation Bd.* v. *Reed* (1963) 215 Cal.App.2d 60, 68 [29 Cal.Rptr. 847], defendant made a motion *in limine* to exclude the testimony of an expert on the ground that he was not qualified. The trial court denied the motion and allowed the expert to testify, although it limited the scope of his testimony. Although defendant

did not renew his objection when the expert testified, the Court of Appeal considered his assignment of error, observing: "The motion in this case was precisely directed at a well-defined issue. It was an entirely proper mode of objection. Once the trial court ruled on it, no further objections or motions were necessary to preserve the point for appeal purposes."

However, in a series of recent cases, we have stated: "Generally when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [251 Cal.Rptr. 278, 760 P.2d 475]; see also *People* v. *Turner* (1990) 50 Cal.3d 668, 708 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 849-850 [268 Cal.Rptr. 802, 789 P.2d 983]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 270, fn. 13 [256 Cal.Rptr. 96, 768 P.2d 610].) In contrast, relying primarily on *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed, supra,* 215 Cal.App.2d 60, Witkin states: "If the motion [*in limine*] is denied, the ruling may be reviewed on appeal without making an objection to the prejudicial matter at the trial." (3 Witkin, Cal. Evidence, *supra,* § 2011 at p. 1971.)

The apparent contradiction in these general statements can be reconciled by focusing on the provisions of Evidence Code section 353. In some cases, a specific objection to a particular body of evidence can be advanced and ruled upon definitively on a motion *in limine*, thus satisfying the requirements of the statute. In this case, for example, defendant made a motion *in limine* to exclude all of the testimony of the two female witnesses based on allegedly coercive terms in their written plea agreements. The motion was clearly and unequivocally denied. The objection was specific, it was directed to an identifiable body of evidence, and it was advanced at a time when the trial judge could give fair consideration to the admissibility of the evidence in its context. Moreover, the Attorney General does not point to any event in the trial occurring after the *in limine* ruling and before the evidence was offered that so changed the context as to constitute a basis for reconsideration of the ruling. Under these circumstances, defense counsel was justified in concluding that a mere repetition of the same objection advanced on the motion *in limine* would serve no useful purpose. The objection having been made and ruled upon, the issue was preserved for appeal. (*Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed, supra,* 215 Cal.App.2d at pp. 67-68.)

In other cases, however, a motion *in limine* may not satisfy the requirements of Evidence Code section 353. For example, it may be difficult to specify exactly what evidence is the subject of the motion until that evidence is offered. Actual testimony sometimes defies pretrial predictions of what a

witness will say on the stand. Events in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353. As we observed in *People* v. *Jennings, supra,* "[U]ntil the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility." (46 Cal.3d at p. 975, fn. 3.) In these kinds of circumstances, an objection at the time the evidence is offered serves to focus the issue and to protect the record. As one trial practice text advises: "An unsuccessful motion [*in limine*] can serve the same purpose as an objection at trial in preserving the record on appeal . . . . However, the motion should be sufficiently clear and specific to allow the appellate court to determine whether it would have been redundant to have also objected at the time the evidence was going to be introduced." (Cal. Trial Objections 2d (Cont.Ed.Bar 1984) § 1.7, p. 11.)

██ In summary, we hold that a motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal.

Our holding in this regard is necessarily confined to classic *in limine* motions, i.e., those motions heard at the beginning of or during trial by the trial judge. Other kinds of pretrial motions not heard by the trial judge, e.g. those made under section 1538.5, will continue to be governed by their own particular rules and standards regarding the preservation of error for appeal.

Notwithstanding our holding, the better practice in handling motions *in limine* is undoubtedly for the parties to stipulate to the effect of the court's rulings (as they did in *People* v. *Jennings, supra,* 46 Cal.3d 963) or for the trial judge to make it clear to counsel at the end of *in limine* arguments not only what the ruling on the motion is, but whether further objection or argument is desired when the evidence is presented. If this is done, the stipulation or order of the trial court will be respected in the appellate

court's determination whether error has been properly preserved. As one commentator has cautioned: "[W]hen an *in limine* motion to exclude evidence is denied, counsel should get a clear understanding on the record that counsel need not object when the evidence is sought to be introduced during trial so as to preserve the right to argue the point on appeal. If this is not done, counsel should consider objecting during trial when the evidence is sought to be introduced so as to avoid any possibility of waiving the right to argue the point on appeal." (1 Cal. Civil Procedure During Trial (Cont.Ed.Bar 1982) § 6.48, p. 246.)

As we have noted, defendant's *in limine* motion satisfied the requirements of Evidence Code section 353 as we have described them. Therefore, we will consider his argument on the merits.

 Relying on the rule of *People* v. *Medina* (1974) 41 Cal.App.3d 438, 455 [116 Cal.Rptr. 133], defendant initially argues that conditioning the grant of immunity to Eckstrom on the fact that she did not personally injure Van Zandt necessarily tainted her testimony. As we observed in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1251-1252 [232 Cal.Rptr. 849, 729 P.2d 115]: " '[A] defendant is denied a fair trial *if the prosecution's case depends substantially upon accomplice testimony* and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.' (*People* v. *Medina* (1974) 41 Cal.App.3d 438, 455 [116 Cal.Rptr. 133].) Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police (*id.*, at p. 450), or that his testimony result in the defendant's conviction (*People* v. *Green* (1951) 102 Cal.App.2d 831, 837-839 [228 P.2d 867]), the accomplice's testimony is 'tainted beyond redemption' (*Rex* v. *Robinson* (1921) 30 B.C.R. 369) and its admission denies the defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid. (*People* v. *Fields* [(1983)] 35 Cal.3d 329, 361 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Lyons* (1958) 50 Cal.2d 245, 266 [324 P.2d 556].)" (Italics added, fn. deleted.)

 Barrett's testimony was admissible because the only condition remaining at the time of trial was that she testify completely and truthfully. As to Eckstrom's testimony, we need not reach the issue whether the no-injury-to-the-victim condition in her plea agreement is impermissibly coercive under the rule of *Medina, supra,* 41 Cal.App.3d 438. (See *People* v. *Knox* (1979) 95 Cal.App.3d 420, 430-431 [157 Cal.Rptr. 238].) Defendant has not shown any prejudice from the allegedly coercive condition. The

prosecution's case did not depend substantially on Eckstrom's accomplice testimony. Defendant's several detailed pretrial admissions of guilt were the cornerstone of the case against him. The accomplice testimony served primarily to supply details and to clarify occasional vagueness in defendant's admissions. In view of the abundant "corroborating circumstances" showing that Eckstrom was testifying truthfully, including defendant's pretrial admissions, Barrett's testimony, and the physical evidence, there was no reversible error in allowing the testimony. (*People* v. *Watson* (1979) 89 Cal.App.3d 376, 381-382 [152 Cal.Rptr. 471]; *People* v. *Sepeda* (1977) 66 Cal.App.3d 700, 708-709 [136 Cal.Rptr. 119].)

██ Defendant attacks the immunity agreements on other grounds as well. He suggests improper conduct by the prosecutor, cryptically observing that James Reichle, the attorney who negotiated the immunity agreement on behalf of Barrett, became Sierra County District Attorney shortly thereafter and before defendant's trial. Defendant's suggestion ignores the fact that his case was not prosecuted by Mr. Reichle or anyone on his staff, but by Special Prosecutor Gary Rossi, a former San Joaquin County deputy district attorney, who was specifically appointed to handle this prosecution. Defendant made no motion to recuse the prosecutor. He points to no evidence that Mr. Reichle or anyone under his supervision or direction either influenced or was in a position to influence the prosecution of defendant in any unfair way. In the absence of such evidence, we will not indulge in any speculation that the prosecutor did not exercise his discretion in an evenhanded manner or that personal *animus*, bias, or improper receipt of confidential information played any role in defendant's prosecution. (See *People* v. *Hamilton, supra,* 46 Cal.3d at pp. 140-141; *In re Charles L.* (1976) 63 Cal.App.3d 760, 764-765 [132 Cal.Rptr. 840].)

██ Finally, defendant urges that Barrett and Eckstrom's testimony should have been excluded not only because they were accomplices, but because they were "teenage sisters." Defendant cites no authority for the proposition that teenage sisters are incompetent or inherently unreliable witnesses. Although we have observed that minor accomplices may face *parental* pressure to testify and to blame others, including the accused (*In re Miguel L.* (1982) 32 Cal.3d 100, 108-109 [185 Cal.Rptr. 120, 649 P.2d 703]), there was no evidence of any such pressure in this case. In any event, the jury was allowed to consider fully the credibility of Barrett and Eckstrom after full disclosure of their sibling relationship, their immunity agreements, their prior statements, and other factors relevant to their trustworthiness as witnesses. Because their testimony was not subject to any

blanket rule of exclusion, their credibility was a matter to be weighed and evaluated by the jury.[5]

VIII. *Exclusion of Polygraph Evidence*

██ The defense sought to introduce evidence that Eckstrom had failed a polygraph examination and that Barrett had refused to take one. The trial court rejected the offer of proof, ruling that such evidence was prohibited by Evidence Code section 351.1, which provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any references to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results." Defendant attacks the ruling by challenging the statute on a host of constitutional and other grounds.

We need not consider defendant's challenges because the ruling is sustainable regardless of the effect of Evidence Code section 351.1. Defendant's offer of proof was simply that Eckstrom took a lie detector test and did not pass it. Because defendant did not offer to prove the polygraph's acceptance in the scientific community, the evidence was properly excluded. As we said in *People* v. *Harris* (1989) 47 Cal.3d 1047, 1094-1095 [255 Cal.Rptr. 352, 767 P.2d 619]: "Absent an offer of proof that the polygraph is now accepted in the scientific community as a reliable technique, the evidence was presumptively unreliable and inadmissible." Having failed to make the proper offer of proof, defendant is in no position to assign error in the trial court's ruling.[6]

██ Finally, defendant claims error in the receipt of testimony of Allison Eckstrom's mother, Michele Roberts, that "Allison had to have a

---

[5]Defendant admonishes us to heed the lessons of history by eschewing the "corrupt bargain" that produces accomplice testimony. He invokes vintage authority with the observation:

"Truly it would be hard to take away the life of any person upon such a witness that swears to save his own." (1 Hale, Pleas of the Crown (1680) p. 305.) But defendant's case makes no such demand on us. Even if the accomplice testimony is set aside, it remains that defendant voluntarily and unequivocally confessed his guilt three times: once to a hitchhiker he picked up in Nebraska, once in a detailed statement to Nebraska law enforcement officers, and once in a letter to Avette Barrett. The remaining evidence corroborates the confessions. As we observe in part XXIII, *post*, the evidence of defendant's guilt was overwhelming and any error in admitting the accomplice testimony was harmless beyond a reasonable doubt.

[6]Defendant also argues that the prosecution was estopped to object to the admission of polygraph evidence because of the polygraph condition in Barrett's plea bargain. Defendant did not advance this argument in the trial court when the prosecutor's objection was made; he is now barred from asserting it. (*Roam* v. *Koop* (1974) 41 Cal.App.3d 1035, 1044 [116 Cal.Rptr. 539].)

polygraph test." Roberts's statement is a classic example of blurted-out testimony. It came on cross-examination by defense counsel concerning a prior statement made by the witness. It was offered by the witness by way of background and was not responsive to counsel's question. Defense counsel immediately moved to strike the response and the trial court granted the motion and admonished the jury as follows: "And ladies and gentlemen, you are not to take into consideration anything concerning any mention of any polygraph test. Polygraph tests are not admissible in court. They are not part of this case. You are not to talk about it in your deliberations. You're not to form any opinions one way or the other about any kind of polygraph test, and you are to strike that from your minds."

The trial court's timely and specific admonition, which the jury is presumed to have followed, cured any prejudice resulting from the witness's inadvertent and improper statement. (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 352 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Eads* (1954) 124 Cal.App.2d 393, 402 [268 P.2d 561].) In any event, in view of the overwhelming evidence of defendant's guilt (see pt. XXIII, *post*), there was no prejudice requiring reversal.

IX. *Admission of Defendant's Prior Felony Convictions for Impeachment*

 On defendant's motion *in limine*, the trial court ruled that defendant's prior convictions for kidnapping, attempted rape, assault with intent to commit rape, and car theft would be admitted for impeachment, but that his conviction for escape would not. Defendant maintains that the court did not properly weigh the probative value of his prior convictions for impeachment against their prejudicial effect. (See *People* v. *Castro* (1985) 38 Cal.3d 301, 307 [211 Cal.Rptr. 719, 696 P.2d 111].)

Defendant initially argues the trial court did not make an adequate record of the weighing process preceding its ruling to admit the convictions. To the contrary, the court entertained the arguments of counsel bearing on probative value and prejudice, made several remarks from the bench about remoteness and relevancy, and reviewed each conviction separately during the course of its ruling. Although the court did not specifically articulate all of the factors identified in case law in making its ruling, defendant cites no authority imposing such a requirement. The trial court's ruling was adequately stated and supported by the record. (*People* v. *Holt* (1984) 37 Cal.3d 436, 453 [208 Cal.Rptr. 547, 690 P.2d 1207]; *People* v. *Nguyen* (1988) 204 Cal.App.3d 181, 187 [251 Cal.Rptr. 40].)

Moving to the merits of the trial court's ruling, we find no abuse of discretion. The trial court distinguished among defendant's convictions by

excluding escape and admitting the others. The admitted convictions were seven and nine years old at the time of trial and thus not so remote in time as to preclude their relevance for impeachment. The offenses were crimes of moral turpitude, i.e., they evinced a "general readiness to do evil," and could therefore properly be considered by the jury as impeachment. (*People v. Castro, supra,* 38 Cal.3d at p. 314). They were not identical to the charges against defendant in this case so as to suggest present guilt merely because of past conduct.

Recent case authority supports the trial court's decision to admit the convictions. (*People v. Muldrow* (1988) 202 Cal.App.3d 636, 646-647 [248 Cal.Rptr. 891]; *People v. Castro* (1986) 186 Cal.App.3d 1211, 1216-1217 [231 Cal.Rptr. 269]; *People v. Lewis* (1987) 191 Cal.App.3d 1288, 1297 [237 Cal.Rptr. 64].) Defendant cites no contrary authority.

*X. Defendant's Conversation With a Fellow Jail Inmate About Escaping*

█ Anthony David Brooks, a jail inmate whom defendant met while in custody awaiting trial, testified that defendant asked his assistance in escaping. Brooks reported defendant's request to jail authorities. Defendant denied making the request. Citing out-of-state cases, defendant argues that evidence of an escape attempt was not probative on the issue of his guilt because he was being held on more than one charge and that "it is impossible to determine from which charge defendant escaped and fled." (E.g., *State v. Sanders* (Mo. 1971) 473 S.W.2d 700, 703.) He invites us to reverse his conviction because of the alleged prejudicial effect of the escape-attempt evidence. We decline the invitation.

At trial defendant moved to exclude Brooks's testimony, asserting that jailhouse informants are unreliable witnesses. The trial court held a pretrial hearing on the motion, but made no ruling. Defendant failed to request a ruling and made no objection when Brooks's testimony was offered. As a result of these events, defendant has waived any claim of error in the introduction of Brooks's testimony for two reasons. First, defendant failed to object to the escape evidence when it was offered. (*People v. Rodgers* (1976) 54 Cal.App.3d 508, 517 [126 Cal.Rptr. 719].) In contrast to the immunity agreement issue (see pt. VII, *ante*), the trial court never made a ruling on Brooks's testimony. Defendant was obligated to press for such a ruling and to object to Brooks's testimony until he obtained one. He failed to do so, thus depriving the trial court of the opportunity to correct potential error. Second, defendant failed to advance in the trial court the specific ground for exclusion he now urges. Defendant's motion was directed to the alleged unreliability of jailhouse informants, not to any inherent ambiguity

in escape-attempt evidence when multiple crimes are charged. The motion was therefore not sufficiently specific to preserve the alleged error. (Evid. Code, § 353; *People* v. *Coleman, supra,* 46 Cal.3d at p. 777; *People* v. *Ghent, supra,* 43 Cal.3d at p. 766.) Because of defendant's procedural omissions, the trial court had no fair opportunity to consider excluding this evidence. Therefore, defendant cannot challenge its ruling on appeal.

We also reject the claim on the merits. Evidence of a planned escape permits an inference of consciousness of guilt, even if the escape was not actually attempted. (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1143-1144 [245 Cal.Rptr. 635, 751 P.2d 901].) California follows the majority rule in allowing evidence of an attempted escape even when multiple crimes have been charged. (*People* v. *Remiro* (1979) 89 Cal.App.3d 809, 845 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135]; Annot., Attempted Escape (1981) 3 A.L.R.4th 1085, 1087-1093.) We see no reason to consider changing the rule. In any event, as in *People* v. *Williams,* any error in the abbreviated reference to escape plans was harmless in light of the overwhelming evidence of defendant's guilt.

## XI. *The Admission of Statements Made by Defendant to Nebraska Law Enforcement Officers*

Defendant challenges the trial court's admission, over his objection, of three statements he made to Nebraska law enforcement officers, one before and two after his arrest. He argues that the use of these statements violated his Fifth and Sixth Amendment rights. For convenience, the challenged statements will be referred to as: (1) the prearrest statement, (2) the prearraignment statement, and (3) the postarraignment statement. For the reasons stated below, we find no violation of defendant's rights in the admission of any of the statements.

### A. The Prearrest Statement.

Thomas Logan, a hitchhiker who was picked up by defendant and his two female companions in the van, left their company and placed a "911" call to Nebraska police about 10 p.m. on September 15, 1985. Logan reported that the van's occupants had killed the owner and that the van was full of marijuana. He described the van as a green Dodge camper with California license plates. Logan's report was relayed to state, county, and local police in the area where he was picked up. The green van was traced to a motel parking lot in Lexington, Nebraska. Police converged on the spot and verified that defendant, whose name had been reported by Logan, had rented room 238 and had indicated that he was driving a green van with California license plate number *231* NVL.

Two officers, a state trooper and a chief deputy sheriff, approached the van and, with the aid of the lighting in the motel parking lot and their flashlights, observed four or five pounds of marijuana as well as stains on the curtains. The van's California license plate was *321*NVL. The officers proceeded to room 238. The state trooper knocked and identified himself as a peace officer. Defendant opened the door. The state trooper asked defendant if he was Bruce Morris and defendant answered affirmatively. When the chief deputy asked if the officers could come in, defendant stood back and motioned for them to enter. The state trooper then asked defendant if he was driving the green Dodge van in the lot; defendant responded affirmatively. The state trooper then told defendant that he was under arrest for possession of marijuana.

Although no *Miranda* warnings (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) had been given at this point, the trial court admitted evidence of defendant's answers to the officers' questions. It committed no error. *Miranda* requires that a criminal suspect be admonished of specified Fifth Amendment rights. But in order to invoke its protections, a suspect must be subjected to *custodial interrogation*, i.e., he must be "taken into custody or otherwise deprived of his freedom in any significant way." (*Id*. at p. 444 [16 L.Ed.2d at p. 706].) "[T]he ultimate inquiry is simply whether there is 'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California* v. *Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279, 103 S.Ct. 3517], quoting *Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711].)

Whether custody has occurred short of a formal arrest depends upon the totality of the circumstances, including such factors as: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the indicia of arrest are present; and (4) the length and form of the questioning. No one factor is dispositive. (*People* v. *Boyer, supra,* 48 Cal.3d 247, 272.) And, contrary to defendant's argument, the mere fact that he was a suspect does not establish custodial interrogation. As the Supreme Court observed in *Oregon* v. *Mathiason, supra*: "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the . . . questioned person is one whom the police suspect. *Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'*" (429 U.S. at p. 495 [50 L.Ed.2d at p. 719], italics added.)

In this case, the police questioning was brief and nonaccusatorial—two yes-or-no questions designed to elicit only defendant's identity and

his relationship to the van. The inquiry did not take place in jail or on police premises, but in defendant's own motel room with his two female friends present. (See *People* v. *Butterfield* (1968) 258 Cal.App.2d 586, 590 [65 Cal.Rptr. 765].) It was not accompanied by traditional indicia of arrest, i.e., defendant was not physically restrained or directed to say or do anything. The officers asked whether they could enter, and defendant consented. In view of the confusion concerning the license number of the vehicle, a routine question on that subject did not amount to an accusation or a restraint on defendant's freedom.

In light of these factors, the initial police questioning of defendant and his prearrest statement in response to their questions were noncustodial (or, in effect, precustodial). Therefore, defendant's statements were properly admitted into evidence. (See also *People* v. *Robertson* (1982) 33 Cal.3d 21, 38 [188 Cal.Rptr. 77, 655 P.2d 279] [asking a murder suspect if an automobile linked to a homicide was his did not violate *Miranda*]; *People* v. *Valdivia* (1986) 180 Cal.App.3d 657, 661-662 [226 Cal.Rptr. 144] [police contact with suspect at his brother's home; questioning brief and nonaccusatorial]; *In re Danny E.* (1981) 121 Cal.App.3d 44, 50 [174 Cal.Rptr. 123] [questioning of suspect at home; no objective indicia of arrest or detention; questioning brief and nonaccusatorial].)

■ Our holding in this regard recognizes the value of routine and nonintrusive police inquiry before arrests and accusations are made. Such inquiry serves to minimize mistakes and protect the innocent. As the United States Court of Appeals for the First Circuit has stated: "One of the primary purposes of preliminary questioning is to separate a group of persons possibly involved in a crime into those who should and those who should not be arrested—to decide whether all, some, or none should be charged. To turn all such questioning into custodial interrogation, requiring *Miranda* warnings in all cases, may help those eventually charged. But, it could also seriously interfere with the process of information gathering and on occasion force the police to cast their net of arrest too wide, significantly interfering with the liberty of the innocent." (*Podlaski* v. *Butterworth* (1st Cir. 1982) 677 F.2d 8, 10.)

■ But even if error could be predicated on the admission of defendant's prearrest statement, it would be harmless beyond a reasonable doubt. The information elicited—defendant's name and the fact that he was driving the van—were undisputed throughout the trial. The defense was that defendant's female companions did the killing; defendant never maintained that he did not drive the van. Insofar as the trial was concerned, defendant's answers to the officers' questions represented simple and uncontested facts that could not have prejudiced his defense or influenced the outcome.

## B. The Prearraignment Statement.

Defendant and his two female companions were arrested shortly after midnight. Defendant invoked his right to remain silent in response to a *Miranda* warning given at the county jail at 1:45 a.m. on September 16, 1985. He was not interrogated at that time and was placed in a jail cell.

Defendant's companions waived their *Miranda* rights and gave statements at 1:45 and 2:44 a.m. The record is not clear as to when the two women were arraigned, but it appears that it was around the noon hour on the 16th. Defendant was arraigned at 4:34 p.m. that day. Each of them was arraigned solely on the Nebraska marijuana charges.

Shortly after noon on September 16, defendant asked to speak with an officer. A sheriff's investigator met with defendant in the jailhouse library and asked him what he needed. Defendant replied that he wanted to talk about his California crimes, but wanted some concessions. He requested, among other things, that his companions not be prosecuted and that he be allowed to speak with his girlfriend, Avette Barrett. The investigator responded that he had no power to grant any concession and that he would have to speak with the county attorney. He then contacted the county attorney, who arrived at the jail library 15 to 20 minutes later. The investigator and the county attorney were also joined by a state trooper and the chief deputy sheriff, the officers who had arrested defendant.

The chief deputy sheriff turned on a tape recorder at 2:39 p.m., immediately after his arrival. The state trooper gave defendant a *Miranda* warning and defendant signed a waiver form. At this point, the chief deputy arranged for Barrett to be brought into the library and allowed defendant to speak with her for about five minutes. Defendant told Barrett that he would not allow her to suffer for something she did not do. About 2:45 p.m., the group moved across the street to the courthouse because that building had a better recording system and was less noisy. The interview recommenced at 2:52 p.m. and continued for approximately an hour. During the interview, the investigator told defendant that the investigator could make no concessions and had no jurisdiction over California charging decisions. He also stated that although defendant had requested and been permitted to speak with Barrett, that permission was not an inducement offered by the officers to obtain a statement. Defendant expressed agreement with the investigator's statement.

During the interview, defendant confessed to the robbery and murder of Rickey Van Zandt. He admitted his plan to steal Van Zandt's van. He admitted hitting Van Zandt over the head numerous times with a rock the

size of a softball, and with a stick. He stated the women were not present when he hit Van Zandt. He admitted telling Logan, the hitchhiker he had picked up, that he had "knocked out" Van Zandt. He professed that he did not intend to kill Van Zandt, but only to render him unconscious.

■■■ Defendant does not contest the sufficiency of the *Miranda* admonition or the adequacy of his waiver. He maintains, however, that his statement was involuntary and should have been suppressed because of a delay in arraignment and because he was improperly induced to confess by being permitted to speak with Barrett, a conversation which he now calls "a direct benefit or inducement." We reject his contention.

The prosecution must prove the voluntariness of defendant's confession by a preponderance of the evidence. (*Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627-628, 92 S.Ct. 619]; *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) Delay in arraignment is but one factor in determining the voluntariness of a confession. (*People* v. *Harris* (1981) 28 Cal.3d 935, 953-954 [171 Cal.Rptr. 679, 623 P.2d 240]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883].) To justify exclusion of a statement, defendant must show that delay in arraignment produced his admissions or that there was an "essential connection" between illegal detention and admissions of guilt. (27 Cal.3d at pp. 329-330.)

Here defendant was arrested in the early morning hours and arraigned late the following afternoon. This was well within the two-day period allowed by California statute. (§ 825.) Acting within 12 hours of his arrest, defendant himself initiated the interview during which he made the incriminating statements. There were no circumstances indicating involuntariness resulting from delay or any other cause. Defendant cites no controlling authority that would justify suppressing a voluntarily given statement merely because defendant was arraigned a few hours after his companions and on the same day as his arrest. We decline to create any such authority.

Similarly, we find no merit in defendant's claim of improper inducement because he was allowed to speak with his girlfriend for five minutes. ■■■ "A confession is voluntary if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward . . . .' [Citation.]" (*People* v. *Thompson, supra,* 27 Cal.3d at pp. 327-328.) A confession, however, is involuntary where "a person in authority makes an express or clearly implied promise of leniency or advantage for the accused *which is a motivating cause of the decision to confess . . . ."* (*People* v. *Boyde, supra,* 46 Cal.3d 212, 238, italics added.)

The officers expressly disclaimed any promises of leniency and told defendant they had no authority to make decisions about charges that would be prosecuted in California. Defendant cites no authority that would support a holding that a five-minute talk with a girlfriend is a sufficient "inducement" to render a murder confession involuntary. Such an ephemeral benefit cannot reasonably be regarded as sufficient to cause a person to admit against his will the killing of another human being. (See *People* v. *Hendricks* (1987) 43 Cal.3d 584, 591 [238 Cal.Rptr. 66, 737 P.2d 1350] [providing accused person with whiskey and Bible did not improperly induce him to confess]; *People* v. *Thompson, supra,* 27 Cal.3d at pp. 327-328 [accused person's hope that his statement would result in release of his girlfriend was self-motivated and did not induce his confession].)

For these reasons, and based on our independent review of the record, we find defendant's prearraignment statement was wholly voluntary and properly received in evidence.

*C. The Postarraignment Statement.*

Defendant was arraigned on the marijuana charges on the afternoon of September 16. He requested counsel at the arraignment and the matter was continued for two days. Between 7:30 and 8 p.m. that day, the sheriff's investigator learned that California authorities had not been able to locate the victim's body from the information supplied by defendant in the prearraignment statement. The investigator went alone to the jail and met with defendant in the library. He reminded defendant generally of his *Miranda* rights. Defendant helped him draw a map with specific landmarks of the area where defendant had left the victim's body. The map and defendant's postarraignment statement were admitted at trial over his objection. Defendant now claims that, coming after his arraignment and request for counsel on the marijuana charge, this evidence should have been suppressed on both Fifth and Sixth Amendment grounds.

In support of his Fifth Amendment argument, defendant relies principally on *Arizona* v. *Roberson* (1988) 486 U.S. 675 [100 L.Ed.2d 704, 108 S.Ct. 2093], in which a burglary suspect arrested at the scene of a crime responded to a *Miranda* warning with a request for counsel. After remaining in custody for three days without appointment of counsel, he was contacted and questioned by a different officer about a different burglary. The Supreme Court upheld suppression of his incriminating statements to the officer, holding that under the Fifth Amendment such interrogation could occur only if the accused initiated it. *Roberson* is distinguishable. There the defendant clearly and unequivocally cut off all police interrogation, specifically requested counsel, and did nothing to initiate the interview

with the officer. Here defendant initially invoked only his right to silence and not to counsel; initiated the police questioning about Van Zandt's murder himself; and then expressly waived his right to counsel in making the prearraignment statement, a full confession to that crime.

■ The prosecution has the burden of establishing, upon the whole record, a knowing and voluntary waiver of *Miranda* rights. Where, as here, there is no conflict in the evidence, we review the trial court's finding of waiver independently. (*People* v. *Duren* (1973) 9 Cal.3d 218, 237-238 [107 Cal.Rptr. 157, 507 P.2d 1365].) ■ In light of defendant's conduct, his request for counsel at the arraignment on the marijuana charge is not a clear expression of a desire that police interrogation on the murder charge cease until he had consulted with counsel. Because the officer was seeking merely to clarify defendant's earlier voluntary statement and reminded defendant of his *Miranda* rights, there was a continuing waiver of those rights extending to the postarraignment interview and statements and no Fifth Amendment violation. (See *People* v. *Brockman* (1969) 2 Cal.App.3d 1002, 1006 [83 Cal.Rptr. 70].)

■ Defendant's Sixth Amendment claim fares no better. In *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776], the defendant sought to suppress postarraignment statements he made to a fellow inmate, claiming that the inmate was a police agent whose conversation with him violated his Sixth Amendment right to counsel. We rejected his argument on the alternative ground that the information procured by the inmate related to an offense other than the offense with which the defendant had been charged.[7] Quoting *Maine* v. *Moulton* (1985) 474 U.S. 159, 180, footnote 16 [88 L.Ed.2d 481, 499, 106 S.Ct. 477], we observed: " 'Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.' " (44 Cal.3d at p. 561.)

The same rationale applies here. Defendant was arraigned and requested counsel in connection with a Nebraska marijuana charge that arose from a different incident and at a different time and place than the California murder and robbery charges. The latter charges were not pending at the time of the postarraignment interrogation and no attorney had been requested or appointed to represent defendant on those charges. The Sixth Amendment right to counsel "arises from the fact that the suspect has been *formally charged with a particular crime* and thus is facing a state apparatus

---

[7] We also held that the defendant's statements were not deliberately elicited by a police agent because the inmate asked no questions. As a result, the statements were admissible under *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616]. (44 Cal.3d at p. 561.)

that has been geared up to prosecute him." (*Arizona* v. *Roberson, supra,* 486 U.S. at p. 685 [100 L.Ed.2d at p. 716], italics added.) As a result: "[*T*]*he continuing investigation of uncharged offenses* [*does*] *not violate the . . . Sixth Amendment right . . . .*" (*Ibid.* [100 L.Ed.2d at p. 716], italics added.) Because defendant had no Sixth Amendment right with respect to the uncharged crimes of robbery and murder, the use of his statement could not violate such a right. (See also *In re Michael B.* (1981) 125 Cal.App.3d 790, 795-798 [178 Cal.Rptr. 291], and cases cited therein; *People* v. *Booker* (1977) 69 Cal.App.3d 654, 663-665 [138 Cal.Rptr. 347].)

Assuming error in the admission of the postarraignment statement, it was harmless beyond a reasonable doubt. Discovery of the body was not essential to the prosecution's case. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 610-611 [244 Cal.Rptr. 200, 749 P.2d 854].) Defendant did not dispute that Van Zandt had been killed nor did he dispute the location of the body; he contended only that his companions had done the killing. Moreover, defendant had already indicated in his prearraignment statement the basic facts of the murder and the approximate location of the victim's body. In short, defendant had already convicted himself with his own voluntary statements, before the postarraignment interview. He was not prejudiced by the limited additional admissions he made there. (*People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 269-270 [169 Cal.Rptr. 497].)

XII. *The Accidental Playing of Excluded Portions of Defendant's Nebraska Confession and the Prosecutor's Question About One Such Portion*

Before the tape recording of defendant's prearraignment statement was played to the jury, the court and counsel listened to the tape outside the jury's presence. The trial court ruled that a certain portion of the tape, where defendant stated that he had left Sacramento because he was "in some trouble" with "some underground people," would be excised. While expressing doubt that this portion of the tape was prejudicial, the court found it to be of no probative value. By mistake, the excised portion was played. Defendant's counsel moved for a mistrial. The trial court denied the motion and admonished the jury to disregard the excised references. Defendant claims that the inadvertent playing of this portion of the tape denied him a fair trial.

 Initially, the erroneously played portion of the tape was conceivably relevant to the prosecution's case: defendant's desire to flee potential danger in Sacramento might explain why he stole Van Zandt's van. (See, e.g., *People* v. *Perry* (1972) 7 Cal.3d 756, 780-781 [103 Cal.Rptr. 161, 499 P.2d 129].) Moreover, contrary to defendant's argument, the taped refer-

ences do not compel the inference that he was involved in drug dealing or organized crime. He may have been pursued by "underground people" for reasons other than his own criminal acts. In any event, the inference of prejudice is not so overwhelming as to justify reversal, because the offending passage was brief and the trial court admonished the jury to disregard it. (See *People* v. *Rosoto, supra,* 58 Cal.2d at p. 352.)

 Defendant also complains that the prosecutor committed misconduct when he asked defendant whether he had said to Nebraska authorities: "I won't cop to nothing I ain't done." The question and answer were stricken on defendant's objection; the jury was admonished and defendant's motion for mistrial was denied. Again, we find no reversible error. The trial court originally excluded the quoted portion of defendant's statement because it was made in response to a question about other offenses defendant had been charged with, and was, therefore, irrelevant to the pending prosecution. But, as the Attorney General observes, the statement was highly relevant to impeach defendant's testimony that his pretrial admissions of guilt were false and that he did not kill Rickey Van Zandt. Defendant's specific and emphatic assertion at the time of his confession that he would not admit to crimes he did not commit was entitled to be weighed by the jury in assessing the credibility of his recantation.

Moreover, when confronted with the prosecutor's question and defendant's answer, the court ordered them stricken and admonished the jury. It found only inadvertence and not misconduct in the prosecutor's question, noting some ambiguity in its original ruling. Under these circumstances, we perceive nothing that deprived defendant of a fair trial.

For the reasons stated above and as more fully explained in part XXIII, *post,* any asserted error with respect to the taped confession was also harmless beyond a reasonable doubt.

XIII. *Admission of a Copy of Defendant's Letter to Avette Barrett*

 The trial court admitted into evidence a copy of a letter sent by defendant to Avette Barrett in early October of 1985 and signed, "Your husband, Bruce." The copy was made by jail authorities who reviewed her mail. Barrett destroyed the original. Defendant challenges the trial court's ruling, claiming that the admission of the letter violated the best evidence rule and Evidence Code section 352. Neither contention has merit.

Defendant failed to object in the trial court to admission of the letter on best evidence grounds and has, therefore, waived that objection on appeal. (Evid. Code, § 353.) In any event, the objection was not well taken. Evi-

dence Code section 1501 provides that a copy "is not made inadmissible if the writing is lost or *has been destroyed without fraudulent intent on the part of the proponent of the evidence.*" (Italics added.) The prosecution was the proponent of the evidence. But Barrett destroyed the original of the letter and there is no evidence that the prosecution contributed to her decision to do so. The loss or destruction of an original letter by an inmate addressee does not render a copy inadmissible. (*People* v. *Garvey* (1979) 99 Cal.App.3d 320, 324 [160 Cal.Rptr. 73].)

Defendant also argues that a page was missing from the letter, rendering it inadmissible as an altered document under Evidence Code section 1402. As the proponent of the document, the prosecution had the burden of showing its authenticity, including the absence of any material alteration. (Evid. Code, §§ 403, subd. (a)(3), 1400-1402.) The trial court was required to admit the document in evidence if the trier of fact was presented with sufficient evidence to support a finding of authenticity. (*Ibid.*; 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 30.1, pp. 1049-1051.) There was more than sufficient evidence here.

Barrett testified that the prosecution's exhibit was a true and accurate copy of the letter she received and destroyed. Although a handwriting expert acknowledged the possibility of a missing page based on certain features of the letter, Barrett testified that defendant had often written fragmented letters. In short, the trial court was amply justified in rejecting defendant's view that the copy was altered or incomplete. (See *Richardson* v. *Suiter* (1946) 74 Cal.App.2d 682, 685 [169 P.2d 252]; *Meyer* v. *Lovdal* (1907) 6 Cal.App. 369, 375 [92 P. 322].)

Defendant made no Evidence Code section 352 objection to the letter, although he did challenge its relevance. The letter was plainly relevant. Defendant's own handwritten admission that he had killed someone for Barrett with a rock pertains directly to his guilt or innocence. It also contradicts his testimony that Barrett and Eckstrom had killed Van Zandt and his prearraignment statement that he had intended only to knock Van Zandt unconscious. It is true, as defendant observes, that his letter contains references to possible future violent conduct on his part, such as, "I'll kill again if I have to, for you," and, if defendant were denied the opportunity to visit Barrett, "then someone will get hurt, and I mean that, bad! I've killed once for you, and if I have to I'll do it again!!! And you know that I can—you know that I can, and I don't need a rock to do it with either." But defendant did not argue the potential for prejudice in these portions of the letter or ask the trial court to exise these passages. Therefore, he has waived any appellate challenge by failing to advance a "clear and specific" ground for objection in the trial court. (Evid. Code, § 353.)

Moreover, the allegedly irrelevant references were so intermingled with the probative admissions as to make their excision practically impossible. In nearly every sentence of the letter, defendant combines references to his past killing for Barrett with references to his intention to kill for her in the future. Both sets of references show a strong and continuing motivation for his conduct (i.e., his willingness to kill for Barrett or at her request because of his intense feelings toward her) that might be viewed as contrary to defendant's trial testimony as well as his pretrial statements. Such evidence is pertinent on the issue of intent and for impeachment. We cannot reasonably disallow the use of statements subscribed by defendant himself that go directly to the central issues of who committed the crime and why, merely because defendant was overzealous in expressing his propensity for violence. There was no error in the admission or consideration of the letter. (See, e.g., *People* v. *Thompson* (1988) 45 Cal.3d 86, 124-125 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Hendricks, supra,* 43 Cal.3d at p. 594; *People* v. *Miranda* (1987) 44 Cal.3d 57, 111 [241 Cal.Rptr. 594, 744 P.2d 1127].)

XIV. *Admission of Electrophoresis Test Evidence to Identify Bloodstains*

 Defendant challenges the trial court's decision to admit the results of electrophoretic testing of bloodstains found at the site of Van Zandt's murder and on the clothes seized when defendant and his two companions were arrested. He asserts the prosecution did not establish the scientific reliability of the test under the *Kelly/Frye* rule. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145].) The rule requires the proponent of expert testimony based on the application of a new scientific technique to establish three things: (1) the technique or method is sufficiently established to have gained general acceptance in its field; (2) testimony with respect to the technique and its application is offered by a properly qualified expert; and (3) correct scientific procedures have been used in the particular case. (*Kelly, supra,* 17 Cal.3d at p. 30.) Citing our decision in *People* v. *Brown* (1985) 40 Cal.3d 512, 530-533 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds in *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], in which we found that the prosecution had failed to meet its burden of establishing the scientific acceptability of electrophoresis, defendant maintains that a similar failure occurred here. His argument is unpersuasive.

Electrophoresis allows typing of individual blood proteins and enzymes found in a blood sample by a method that separates electrically charged molecules. A few months after defendant's trial, the Court of Appeal found that it had gained general acceptance in the scientific community. Review-

ing a record containing extensive expert testimony on the subject, the Court of Appeal observed that the only dissenting voice on the issue of general acceptance, Dr. Benjamin Grunbaum, emphasized only remediable defects in the knowledge and ability of the analyst rather than in the technique itself. (*People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1137-1144 [242 Cal.Rptr. 496].) *Reilly* has been followed by two other panels of the Court of Appeal. (*People* v. *Yorba* (1989) 209 Cal.App.3d 1017, 1023 [257 Cal.Rptr. 641]; *People* v. *Morris* (1988) 199 Cal.App.3d 377, 383 [245 Cal.Rptr. 52].) We, too, have endorsed *Reilly*, although in dictum. (*Coleman, supra,* 46 Cal.3d at p. 779, fn. 23.) Electrophoresis has been found acceptable in at least 19 appellate decisions from 11 states. (Annot., Admissibility, in Criminal Cases, of Evidence of Electrophoresis of Dried Evidentiary Bloodstains (1989) 66 A.L.R.4th 588, 593-602, and cases cited; *State* v. *Fenney* (Minn. 1989) 448 N.W.2d 54.) Most of these cases were decided after *Reilly*.

Only Michigan has refused admission of electrophoresis testing, as shown by *People* v. *Young* (1986) 425 Mich. 270 [391 N.W.2d 270].[8] But, since *Young*, Dr. Grunbaum, who was also the chief defense expert witness there, has apparently abandoned his attack on the testing method to focus on the prospect of analyst error rather than inherent defects. He and other scientists now concede the reliability of the method if it is properly carried out. (See *Reilly, supra,* 196 Cal.App.3d at pp. 1148-1150.) Moreover, the *Young* decision has been criticized in two jurisdictions and no jurisdiction, other than Michigan, appears to follow it. (E.g., *State* v. *Fenney, supra,* 448 N.W.2d at p. 60; *State* v. *Surface* (S.D. 1988) 440 N.W.2d 746, 750; Annot., *supra*, 66 A.L.R.4th at pp. 593-602.)

Based on the virtually unanimous appellate authority upholding the admission of evidence from electrophoresis testing, we hold that such testing was sufficiently accepted in the scientific community at the time of defendant's trial.[9] Significantly, defendant does not allege any specific defect in the

[8] One Illinois appellate case, *People* v. *Harbold* (1984) 124 Ill.App.3d 363 [464 N.E.2d 734], also refused admission of electrophoresis evidence because, on the record before it, there were serious questions about the reliability of the technique and no evidence of its acceptance other than its use in crime laboratories. Later Illinois decisions, based on more comprehensive records of scientific acceptability, have endorsed admission of the evidence. (E.g., *People* v. *Henne* (1988) 165 Ill.App.3d 315 [518 N.E.2d 1276]; *People* v. *Partee* (1987) 157 Ill.App.3d 231 [511 N.E.2d 1165].)

[9] Defendant's observation that his case was tried a few months before *Reilly* (*supra*, 196 Cal.App.3d 1127) was decided is of no avail. The trial judge here had before him the trial court record in *Reilly* and the findings that *Kelly/Frye* had been satisfied there. Every appellate case decided since defendant's trial has found electrophoresis to be generally accepted in the scientific community. Because defendant has not shown "new information which may question the continuing reliability of the test" or any "change in the consensus within the

technique either in general or as applied in his case. The prosecution expert was specially trained in the use of the technique; his qualifications were accepted by defendant's trial counsel. He testifed to his procedures in this case and his belief as to their reliability. Defendant does not establish a failure to use correct scientific procedure or any other act or omission that affected the reliability of the testing or analysis in this case. There was no violation of the *Kelly/Frye* rule.

## XV. *Admission of Testimony From the Victim's Mother*

■ The prosecution called Lowelene Helms, the victim's mother, as its first witness. Before she testified, defendant objected to any attempt by the prosecution to ask her to identify the autopsy photos of her son's corpse, noting that the photos had already been ruled admissible. The trial court sustained the objection and precluded the testimony, noting the potentially inflammatory effect of such questioning. In an effort to preclude other testimony by Ms. Helms, defense counsel offered to stipulate that: (1) the victim was in lawful possession of the van; (2) he had his mother's consent to use it and her credit cards; and (3) she had given such permission to no one else. The prosecutor declined to accept the stipulation and the trial court refused to compel acceptance. Ms. Helms took the stand, testifying very briefly (her testimony occupies approximately five transcript pages) to matters included in the proffered stipulation as well as others. Defendant contends that her testimony was calculated to inflame and prejudice the jury and that reversal is required. We disagree.

Initially, there was no defense objection to several items in Ms. Helms's testimony that are now claimed to be inflammatory or prejudicial, e.g., (1) her reference to her husband's death from cancer and to her loan of the van to her son so he could "get away"; and (2) her identification of photos of her son while alive. In the absence of an objection, defendant has waived any error in the admission of this evidence. (Evid. Code, § 353.)

Although the court should have required a stipulation on routine evidence to avoid the prospect of prejudicial victim-impact testimony (see *People* v. *Bonin* (1989) 47 Cal.3d 808, 848-849 [254 Cal.Rptr. 298, 765 P.2d 460]; *People* v. *Brown* (1988) 45 Cal.3d 1247, 1262 [248 Cal.Rptr. 817, 756 P.2d 204]), we find no reversible error from its failure to do so. The testimony given by Ms. Helms was brief, concise, and primarily directed to routine and undisputed matters. We cannot conclude that the jury's passions or prejudices were excited by such innocuous references. Moreover, any error

---

scientific community" concerning electrophoresis, he cannot sustain his challenge. (*People* v. *Smith* (1989) 215 Cal.App.3d 19, 25-26 [263 Cal.Rptr. 678].)

in this regard was clearly harmless in light of the overwhelming evidence of defendant's guilt. (See pt. XXIII, *post*.)

XVI. *Removal Orders for Defense Witnesses in the Custody of the Sierra County Sheriff*

In an effort to impeach Barrett's testimony, the defense called as witnesses three of her fellow inmates in the Sierra County jail. Essentially, they testified to conversations with her in which she stated, consistent with defendant's testimony at trial, that defendant was "taking the rap" for her. Defendant observes that in order to call these witnesses he was required to apply for and obtain removal orders that were served on the Sierra County Sheriff. Because the sheriff informed the prosecutor about the orders, he was able to interview the defense witnesses before they testified. Based on these events, defendant claims a violation of both his Fifth Amendment rights and our decisions in *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 526-527 [134 Cal.Rptr. 774, 557 P.2d 65], and *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673], in which we held that a criminal defendant cannot be compelled to reveal the names of prospective witnesses because disclosure might serve to lessen the government's burden of proof.

We need not reach the merits of defendant's argument because he has waived any alleged error. The record reveals that defendant made no request for a protective order or other relief that might have kept the identities of his witnesses confidential until they were summoned to court. (See *Millaud* v. *Superior Court* (1986) 182 Cal.App.3d 471, 476 [227 Cal.Rptr. 222]; *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190, 205-207 [124 Cal.Rptr. 427].) Instead, defendant's first and only complaint about these witnesses was a motion to expedite their return to Sierra County because they were being "harassed" in the San Joaquin County jail. The declaration of defense counsel supporting that motion stated in part that the "witnesses have been cooperative and *at our request have talked to the prosecution*, after the prosecution independently identified who those witnesses were, apparently after a removal order was served on them . . . ." (Italics added.) Having thus made no attempt to deny the prosecution access to his witnesses, defendant is in no position to complain that it interviewed them.

Moreover, defendant supplies no evidence of any prejudice from the prosecution interviews. The prosecution did not rely on the witnesses to establish or bolster its case; they were called by the defense to impeach Barrett's testimony. Nothing in the record suggests prosecution interviews of these witnesses resulted in any involuntary or coerced testimony, or

otherwise deprived defendant of his opportunity to present a defense. ██ ██ Again, we find no reversible error.[10]

## XVII. *Defendant's Absence From a Jury Instruction Conference*

Defendant contends his federal and state constitutional rights to be present at all critical stages of his case were violated when he was absent from an informal, unreported conference between the court and counsel concerning jury instructions. The day after the informal conference the trial court held a formal conference on the record, dealing with the same subject at which defendant was present.

 Defendant is not entitled to be present either in chambers or at bench discussions on questions of law. His presence on these occasions does not bear a "reasonably substantial relation to the fullness of his opportunity to defend" himself against the charges. (*People* v. *Bittaker, supra,* 48 Cal.3d at p. 1080; *People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149] [interpreting §§ 977 & 1043].) Consistent with this principle, an informal conference on jury instructions is not a proceeding at which a defendant's presence is constitutionally necessary. (*United States* v. *Sherman* (9th Cir. 1987) 821 F.2d 1337, 1338-1339, and cases cited; *United States* v. *Graves* (5th Cir. 1982) 669 F.2d 964, 972, and cases cited.) Moreover, there was no demonstrable prejudice to defendant here because he was present at the conference held the next day which actually settled the instructions. (*People* v. *Bittaker, supra,* 48 Cal.3d at pp. 1080-1081.)[11]

## XVIII. *Accomplice Testimony Instructions*

The court instructed the jury as a matter of law that Avette Barrett and Allison Eckstrom were accomplices and that their testimony had to be corroborated. It defined an accomplice in accordance with CALJIC No. 3.10 as a person who has "aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person that committed the offense and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense."

---

[10] We agree with defendant that the prosecution's attempt to impeach one of the inmate witnesses on the ground that she was a former devil worshipper was improper. Devil worship was not shown to have any bearing on the witness's credibility or the issues in this case. But any error in this regard was harmless beyond a reasonable doubt. (See pt. XXIII, *post.*)

[11] In passing, we note our disapproval of unreported conferences on matters of substantial controversy in capital cases. Although we discern no prejudice in this case, proceedings in capital cases should be conducted on the record to remove any conceivable doubt as to what took place and to preclude unnecessary disputes and delays in settling the record for further proceedings. (See § 190.9.)

■ Defendant claims reversible error because the court did not further instruct the jury, as he requested, that an accomplice could also be a person who "directly" committed the crime. He maintains that without his proposed addition the instruction undermined his defense that Barrett and Eckstrom were the actual killers by constituting a forbidden "conclusive presumption." There are two short answers to defendant's claims. First, we rejected similar claims in *People* v. *Heishman* (1988) 45 Cal.3d 147, 162-163 [246 Cal.Rptr. 673, 753 P.2d 629], in which we commented: "The instruction could not reasonably be understood as precluding rejection of [the witness's] testimony—including rejection based on a conclusion that in fact [the witness] was the killer." Contrary to defendant's proferred distinctions, our holding there clearly rested on the language of the instruction as opposed to the specific facts and is not fairly distinguishable. Second, any error in declining defendant's proposed modification of the instruction was harmless beyond a reasonable doubt in view of the overwhelming evidence of his perpetration of Van Zandt's murder. (See pt. XXIII, *post.*)

XIX. *The Homicide Instructions*

Defendant challenges the homicide instructions on several grounds.

■ First, he argues that the court's omission of CALJIC Nos. 8.70, 8.71, and 8.73 created a charge that did not adequately distinguish between first and second degree murder. The omitted instructions tell the jury of its duties to state the degree of murder in its verdict and to return a verdict of second degree murder if it has a reasonable doubt on the issue of degree.

The omission of these instructions was not error. The evidence in this case established either that Van Zandt was killed by defendant as a part of a robbery (the prosecution theory) or by Barrett and/or Eckstrom, with or without justification (the defense theory). Defendant advances no theory consistent with the evidence that would have allowed the jury to convict him of second degree murder.[12] Hence, his objections concerning instructions about that offense are unfounded. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Teale* (1965) 63 Cal.2d 178, 192-193 [45 Cal.Rptr. 729, 404 P.2d 209].)

■ Second, defendant argues that the trial court erroneously declined his request that the jury be instructed that first degree felony murder does not apply to a homicide resulting from the perpetration or attempt to

---

[12] Defendant's hypothesis—that the jury might have concluded he was provoked into killing Van Zandt when Barrett told him Van Zandt had tried to rape her—is without evidentiary support. The jury would have had to reject the testimony and pretrial admissions of all of the witnesses, including defendant himself, to reach this conclusion.

perpetrate an assault with a deadly weapon. He suggests that the jury might have concluded that he was guilty of first degree felony murder based on his assault on Van Zandt, while rejecting the prosecution's contention that he intended to commit robbery.

In light of the court's actual charge, defendant's suggestion cannot be supported. Robbery was the only felony mentioned by the court in the felony-murder instructions. The jury was told that in order to find defendant guilty of murder it would have to find as an essential element of the crime that "the killing occurred during the commission of a felony, to wit: Robbery." There were no instructions allowing consideration of assault as a felony to which the felony-murder rule would apply. Assault was not mentioned at all by the court. Indeed, it was mentioned only by defense counsel in his argument to emphasize, consistent with the instructions, that a mere assault on the victim was not enough to convict defendant of first degree murder. Under these circumstances, defendant's suggestion that the jury found him guilty of felony murder because of an assault on Van Zandt amounts to speculation.

Even assuming the court erred in refusing the requested instruction on assault, the error could not have prejudiced defendant. The jury's findings that defendant was guilty of felony murder and robbery, and that the robbery special circumstance was true, necessarily encompassed a determination that defendant formed an intent to steal before he struck Van Zandt and that he carried out the fatal beating to effectuate that intent.[13] Defendant's claim of prejudice is inconsistent with the jury's determination and is, for that reason, rejected. (See *People* v. *Turner* (1990) 50 Cal.3d 668, 691-693 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Melton* (1988) 44 Cal.3d 713, 745-747 [244 Cal.Rptr. 867, 750 P.2d 741].)

 Finally, defendant complains that the trial court gave superfluous instructions on involuntary manslaughter and other classes of homicide. The jury was told to disregard any inapplicable instructions. Particularly in

---

[13] The instructions emphasized that the defendant could not be convicted of felony murder unless the jury concluded that he formed an intent to steal before he killed Van Zandt and then carried out his murder to further that intent. For example, the jury was told: "The prosecution must also prove beyond a reasonable doubt that the intent to commit the crime of robbery arose before or during the commission of the acts which result[ed] in the death of the victim. If you have a reasonable doubt that defendant formed the intent to commit robbery only after engaging in the fatal acts, you may not convict of first degree murder on the felony-murder rule." In addition, the jury was directed that it could find true the robbery special circumstance only if defendant had committed murder in order to carry out or advance the commission of a robbery or to facilitate escape or detection, and was further admonished that the robbery could not be "merely incidental" to the murder. By returning its verdicts of felony murder, robbery, and the robbery special circumstance, the jury necessarily determined that defendant intended to steal and killed in order to do so.

view of the abundant evidence supporting defendant's conviction of first degree felony murder with a robbery special circumstance and the absence of any inference that any inapplicable instruction improperly influenced the verdict, we discern no prejudice from the extra instructions. (*People* v. *Lanphear* (1980) 26 Cal.3d 814, 835 [163 Cal.Rptr. 601, 608 P.2d 689]; *People* v. *Hesslink* (1985) 167 Cal.App.3d 781, 791-792 [213 Cal.Rptr. 465].)

XX. *Omitted Instructions on Witness Credibility, Oral Admissions, Evaluation of the Evidence, and Reasonable Doubt*

▬ Defendant faults the trial court for declining to give certain requested instructions relating to evaluation of the evidence presented at trial. Again, we find no reversible error in any of defendant's contentions.

Although an instruction on the failure to explain or deny evidence directed to all witnesses as opposed to just defendant would have been appropriate in this case, we have previously rejected defendant's argument that the failure to frame the instruction in this way is prejudicial. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 681-684 [156 Cal.Rptr. 871, 597 P.2d 130].)[14] Moreover, the court instructed the jury that it could consider prior inconsistent statements as bearing on a witness's credibility. That instruction effectively allowed defendant to argue and the jury to consider the credibility of other witnesses, including Barrett and Eckstrom, based on their testimony as compared with their prior out-of-court versions of events. It remedied any deficiency that might have occurred in this area.[15]

Defendant further challenges the trial court's rejection of his instruction that the jury should view with distrust the evidence offered by a party if that

[14] Defendant also contends the jury should have been told that it could draw a favorable inference from defendant's testimony which explained or denied adverse evidence. The proposed instruction was both potentially misleading and unnecessary to the jury's consideration of the evidence. Merely denying adverse evidence or proffering an explanation, however implausible, does not justify an inference in defendant's favor. The jury was fully instructed as to the general factors to be used in evaluating witness credibility, e.g., internal consistency of defendant's testimony, whether it was supported or contradicted by other evidence, etc. It was therefore capable of evaluating defendant's testimony in accordance with the instuctions given.

[15] For the same reason, we reject defendant's contention that the trial court committed reversible error in eliminating from CALJIC No. 2.20, which discusses factors related to witness credibility, the factor of "the character of the witness for honesty or truthfulness or their opposites." The only testimony to which the omission could possibly have referred was that of Del Ann Lenore Crane, a fellow inmate, who expressed her opinion that Barrett was a "liar." But her testimony reveals that her conclusion in this regard was based primarily on Barrett's inconsistent statements, which were thoroughly explored in cross-examination by counsel and as to which the court gave complete instructions. An instruction directed to bare reputation or opinion evidence would not have significantly intensified the jury's scrutiny of Barrett's testimony.

party had the ability to produce stronger and more satisfactory evidence. He points to observations by his trial counsel that the prosecution did not produce in evidence any analysis of the types of blood found on certain rocks. But defendant fails to explain how this evidence was "stronger" or how its introduction could have aided his cause. Because defendant has not shown that the instruction he proposed related to a material matter, his assignment of error fails. (See *People* v. *Simms* (1970) 10 Cal.App.3d 299, 312-313 [89 Cal.Rptr. 1].)

Defendant also asks us to find error in the trial court's failure to give his instruction that "no class of evidence is more subject to error or abuse" than evidence of an oral admission and that witnesses "are generally unable to state the exact language of an admission." As phrased, the instruction was exaggerated and argumentative. We find no error in its exclusion from the charge. (*People* v. *Rice* (1976) 59 Cal.App.3d 998, 1004 [131 Cal.Rptr. 330].)

Finally, defendant claims the trial court erred in failing to give his proposed instruction on reasonable doubt. The trial court included in its instructions CALJIC No. 2.90, which is based on section 1096 and has been recognized as a constitutionally sound description of reasonable doubt. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 881 [251 Cal.Rptr. 227, 760 P.2d 423]; *People* v. *Rubalcava* (1988) 200 Cal.App.3d 295, 300-301 [246 Cal.Rptr. 75].) No additional instructions on reasonable doubt were necessary. (§ 1096a; *People* v. *Williams* (1970) 10 Cal.App.3d 638, 644 [89 Cal.Rptr. 143].)

### XXI. *Omitted Instructions on Other-crimes Evidence, Jury Note-taking, and Consideration of Separate Charges*

Defendant asserts error in the court's omission of CALJIC No. 2.50, which instructs the jury as to the limited use of other-crimes evidence. He contends that the jury's consideration of evidence related to his possession of marijuana in Nebraska prejudiced his defense. Initially, defendant did not request that this instruction be given and the trial court had no duty to give it sua sponte. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1020 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Bunyard, supra,* 45 Cal.3d 1189, 1225-1226 & fn. 24.) Moreover, and particularly in view of the abundant evidence of his guilt, defendant does not demonstrate how the jury's knowledge that he and his companions had harvested a few pounds of marijuana could have prejudiced his defense or made any difference in the verdicts rendered.

Similarly, defendant did not request CALJIC No. 17.48, an instruction on jury note-taking. Although it is the better practice to give the

instruction, the trial court is not required to do so sua sponte. (*People* v. *Harris, supra,* 47 Cal.3d 1047, 1096; *People* v. *Silbertson* (1985) 41 Cal.3d 296, 303 [221 Cal.Rptr. 152, 709 P.2d 1321].) In addition, defendant shows no conceivable prejudice from the failure to give the instruction.

Finally, defendant contends the trial court should have given CALJIC No. 17.02, concerning the jury's duty to consider and decide each charged count separately. Again, defendant did not request the instruction and asks us to hold that it should have been given sua sponte. Defendant acknowledges our rejection of his contention in a noncapital context (*People* v. *Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1]), but asks us to reach a different result in capital cases because of the heightened requirement for reliability in decisionmaking. (*Caldwell* v. *Mississippi, supra,* 472 U.S. at p. 323 [86 L.Ed.2d at pp. 235-236].)

Under the circumstances of this case, we decline defendant's request. Although the instruction is a useful one in any case of multiple charges and is properly given on request, it was not essential to fair consideration of the straightforward and distinct charges here. There were but two charges against defendant—first degree felony murder and robbery. Defendant was accused of killing the victim in order to steal his van. A reasonable jury would have had no difficulty distinguishing between the two charges or giving them independent consideration in light of the evidence.

## XXII. *The Willfully False Statement Instruction*

Defendant assigns as reversible error the following instruction to the jury: "If you find that before this trial the defendant made willfully false or deliberately misleading statements concerning the charges upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt. The weight to be given such a circumstance and its significance, if any, are matters for your deliberation."

Although acknowledging the instruction is appropriate in some cases, defendant maintains that it violated his due process rights because his pretrial statements were inculpatory and he himself testified that they were false. He argues that if the jury found his pretrial statements to be false, it should have found him innocent and not conscious of guilt as the instruction suggests.

Defendant misreads the instruction. At the threshold, it required the jury to determine whether defendant made willfully false or deliberately misleading pretrial statements "concerning the charges." If the jury found

defendant made no such statements (e.g., because his pretrial admissions of guilt were true), it also necessarily found the balance of the instruction inapplicable. If, on the contrary, the jury found defendant made at least some false statements (e.g., that he did not intend to kill Van Zandt or that Barrett encouraged him to commit the crimes), it could reasonably infer consciousness of guilt. In either event, defendant's case was not prejudiced by the instruction. Particularly when, as here, the trial court further instructed that there may be reasons for false statements consistent with innocence, such as attempts to protect another, defendant had a full opportunity to argue his case. There was no error.

XXIII. *Guilt Phase Errors as Harmless Beyond a Reasonable Doubt*

 Defendant argues that the cumulative effect of the various errors at the jury selection and in the guilt phase requires reversal of the jury's finding of guilt. To the contrary, we find that the cumulative effect of any conceivable errors, including those defendant contends to be of federal constitutional dimension, was harmless beyond a reasonable doubt under the rule of *Chapman* v. *California* (1967) 386 U.S. 16, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].

Defendant's prearraignment statement, properly admitted in evidence, contains a full and voluntary confession to the crimes of robbery and first degree felony murder with the special circumstance of robbery. The statement includes facts supporting the essential elements of these crimes. Briefly summarized, the evidence from this statement shows that defendant planned to steal the victim's van; that he hit the victim over the head numerous times with a rock and a stick; and that he drove away in the van after leaving his victim facedown in a ditch. The victim's death was a natural consequence of defendant's conduct toward him. When considered together with the physical evidence and defendant's other properly admitted pretrial statements to officers, his cellmates, and others, the inference of his guilt becomes overwhelming.

Although defendant did testify in his own behalf, repudiating his numerous inculpatory statements, the evidence of his guilt was sufficiently strong to allow us to conclude that any conceivable cumulation of guilt phase errors would not have affected the outcome of his case. (See *United States* v. *Hasting* (1983) 461 U.S. 499, 507-512 [76 L.Ed.2d 96, 105-108, 103 S.Ct. 1974] ["overwhelming evidence of guilt" plus "scanty" and inconsistent evidence offered by defendants allows reviewing court to find error harmless beyond a reasonable doubt]; see also *People* v. *Lee* (1987) 43 Cal.3d 666, 674-679 [238 Cal.Rptr. 406, 738 P.2d 752].)

THE PENALTY PHASE

XXIV. *Evidence of the Underlying Facts of Defendant's Prior Violent Crimes*

In the penalty phase, the prosecutor called as witnesses: (1) a law enforcement officer who had investigated the crimes leading to defendant's 1980 kidnapping conviction and (2) the victim of defendant's 1978 kidnapping, assault, and attempted rape convictions. Each testified in detail as to the respective facts underlying defendant's crimes.

Cognizant of our prior holding that this kind of testimony is proper at the penalty phase "where it is not the fact of conviction which is probative . . . but rather the *conduct* of defendant which gave rise to the offense" (*People v. Gates* (1988) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]), defendant advances a battery of constitutional arguments against consideration of the underlying facts of prior crimes at the penalty phase.

■ Initially, defendant argues that his Eighth Amendment rights were violated by consideration at the penalty phase of what he calls stale evidence of his prior crimes. As defendant acknowledges, we have already rejected a contention that expiration of the statute of limitations precludes consideration of unadjudicated prior criminal conduct at the penalty phase. (*People v. Heishman, supra,* 45 Cal.3d at p. 192; see also *People v. Robertson* (1989) 48 Cal.3d 18, 42-43 [255 Cal.Rptr. 631, 767 P.2d 1109].) Here, defendant was charged with and pleaded guilty to crimes following the incidents presented to the jury. Having had an opportunity to litigate the facts of those incidents at the time of his convictions as well as at the penalty phase, he has no cause to complain of an inability to defend himself. There was no violation of defendant's rights. (*People v. Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189].)

Defendant also renews the following claims of error that we have previously rejected: (1) that the same jury which convicted him of first degree murder was also allowed to consider his guilt of the prior crimes (*People v. Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480]); (2) that admission of prior violent crimes violates the constitutional prohibition on double jeopardy (*People v. Melton, supra,* 44 Cal.3d at p. 756, fn. 17); and (3) that "unadjudicated prior crimes" related to his prior convictions should not be considered at the penalty phase (*People v. Balderas, supra,* 41 Cal.3d at pp. 404-406). Nothing in defendant's argument merits reexamination of our decisions. In addition, we observe that defendant did not attempt to rebut or refute any of this evidence at trial (see *People v. Hamilton, supra,* 46 Cal.3d at p. 144) and that the jury was carefully

instructed not to consider evidence of crimes other than those of which defendant had been convicted. The jury is presumed to have followed the limiting instruction. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 253 [253 Cal.Rptr. 55, 763 P.2d 906].) Under these circumstances, there was no error.

Defendant also claims that the trial court improperly allowed testimony and other evidence concerning the victims of his prior violent crimes which he alleges was in violation of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. As he acknowledges, we rejected this argument in *Karis, supra,* 46 Cal.3d 612, 640-641. The same is true of defendant's argument that the prosecution should have been compelled to accept his offer to stipulate to the facts of his other crimes. (*People* v. *McDowell* (1988) 46 Cal.3d 551, 567-568 [250 Cal.Rptr. 530, 758 P.2d 1060].)

In sum, defendant points to nothing in the record of his prior crimes that amounted to an inaccurate rendition of his prior criminal acts. In accordance with our prior decisions, this evidence was properly considered at the penalty phase.

XXV. *Exclusion of Evidence Concerning Penalty Execution Method and Wrongful Execution as a Result of Mistake*

■ Defendant asked that the jury be allowed to view San Quentin Prison either in person or by introduction of a videotape to hear an explanation of the method of execution. He also sought to introduce evidence about innocent persons who had been wrongfully convicted and executed. The trial court rejected the offers of proof, but permitted defense counsel to argue to the jury the unreliability of death sentences.

Again, there was no error in the court's ruling. At the penalty phase, the jury's attention is properly focused on the circumstances of the offense and the character of the offender, not extraneous information about the manner of execution of sentence. (*People* v. *Thompson, supra,* 45 Cal.3d 86, 138-139; *People* v. *Grant* (1988) 45 Cal.3d 829, 860 [248 Cal.Rptr. 444, 755 P.2d 894].) In this case, as in other capital cases, the jury was told a judgment of death means exactly that. The defendant will lose his life. Further dramatization makes no useful contribution to the process and serves to distract the jury's attention from the task at hand.

Similarly, defendant's offer of proof seeking to present occasions where persons have been wrongfully executed was also properly rejected. The jury was informed that "[t]he adjudication of guilt is not infallible and any lingering doubts you entertain on the question of guilt may be considered by

you in determining the appropriate penalty, including the possibility that at some time in the future, facts may come to light which have not yet been discovered." This straightforward instruction allowed the jury to consider any remaining uncertainty as to defendant's guilt. Nothing further was required to secure to defendant a fair trial on the issue of penalty.

XXVI. *Prosecution Examination of Defense Witnesses*

 Defendant charges the prosecutor with prejudicial misconduct in examining defense witnesses about what he maintains were inadmissible matters. As to the first of these matters—a question directed to defendant's expert, a former San Quentin warden, as to whether he had spoken to the victims of the inmates he referred to in his testimony—defendant waived any alleged error by failing to object. (Evid. Code, § 353; *People* v. *Bell* (1989) 49 Cal.3d 502, 547-548 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Ghent, supra,* 43 Cal.3d at p. 762.) The same is true of defendant's challenges to the prosecutor's questions to the same witness about the murder rate in prison and instances involving the murders of guards and inmates by prisoners.

Defense counsel did object to the following question directed to Reverend Eshelman, a psychologist and former prison chaplain called as an expert by the defense: "In your opinion, as Mr. Morris sits here today, is he a dangerous man?" The objection was sustained and the prosecutor dropped the line of inquiry. In view of Eshelman's direct testimony, there was no misconduct. Eshelman offered his opinion, based on his training as a psychologist and his more than 20 years as a prison chaplain, that defendant was a sensitive and personable man who had a "proven ability to get along and adapt" in a prison environment. According to Eshelman, defendant had participated in prison chapel programs, was one of the highest producers in prison industries, and was cooperative and pleasant. He compared defendant favorably to life sentence prisoners he had known who had made a positive contribution to prison life. While the prosecution is prohibited from offering expert testimony predicting future dangerousness in its case-in-chief (*Adcox, supra,* 47 Cal.3d at p. 257), it may explore the issue on cross-examination or in rebuttal if defendant offers expert testimony predicting good prison behavior in the future. (*People* v. *Gates, supra,* 43 Cal.3d at p. 1211; *People* v. *Coleman* (1989) 48 Cal.3d 112, 150 [255 Cal.Rptr. 813, 768 P.2d 32].) As we said in *Gates:* "If the defense chooses to raise the subject, it cannot expect immunity from cross-examination on it." (43 Cal.3d at p. 1211.)

As in *Gates, supra,* 43 Cal.3d 1168, the prosecutor's question was a permissible attempt to challenge defense expert evidence.[16] Moreover, we note that the question was an isolated one that does not support an inference of prejudice and that any conceivable prejudice could have been cured by a timely admonition, which was not requested by the defense. (E.g., *People* v. *Rich* (1988) 45 Cal.3d 1036, 1089-1090 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 649-650 [244 Cal.Rptr. 181, 749 P.2d 836].) In sum, we find no misconduct in the prosecutor's examination of defense expert witnesses that would justify a reversal.

## XXVII. *Penalty Phase Argument*

■ Defendant cites the prosecutor for misconduct in final argument, alleging "numerous improper comments." At the outset, we note that defendant interposed no objection at trial to any of the prosecutor's comments during final argument; therefore, defendant has waived any error or misconduct that could have been cured by a timely admonition. (*People* v. *Bell, supra,* 49 Cal.3d at p. 548; *People* v. *Lang, supra,* 49 Cal.3d at p. 1041; *People* v. *Lucky* (1988) 45 Cal.3d 259, 293 [247 Cal.Rptr. 1, 753 P.2d 1052].)

Anticipating a waiver finding, defendant asserts that the prosecutor's argument was so egregious that reversal is compelled in any event, apparently because either the trial court should have restrained the prosecutor sua sponte or that defendant's trial counsel demonstrated his ineffectiveness by failing to object. Having reviewed the challenged portions of the prosecutor's argument, we find no merit in either argument.

The prosecutor's argument was a relatively brief one, covering only about 10 pages in the transcript. He began by emphasizing the jury's responsibility to decide whether defendant should live in prison or die. He correctly read to the jury the instruction concerning the factors to be considered in imposing sentence. He then selected various factors and pointed to evidence in the record that related to those factors.

---

[16]The prosecutor also asked Dr. Carroll, a clinical psychologist and another defense expert, whether she felt defendant was a violent individual. She answered that although he had an episode of violence, he was not a violent individual. As with nearly all the incidents of alleged misconduct in prosecution examination, defendant waived any error by failing to object to the question or to make a motion to strike the answer and admonish the jury. In addition, as we have noted with respect to Reverend Eshelman, when the defense produces expert evidence of nondangerousness that includes predictions about defendant's positive contributions to prison life, the prosecution is entitled to reasonable cross-examination, rebuttal, and argument to meet the proffered evidence.

Commenting on defense expert testimony predicting that defendant would adjust well to prison life, the prosecutor asked rhetorically how that could mitigate defendant's vicious crimes. Although defendant reads this remark as an attempt to instruct the jury that prison adjustment cannot be a mitigating factor, in context it amounts to no more than criticism of the mitigating evidence in light of the aggravating evidence. The prosecutor was entitled to argue (based on evidence in the record) that predictions of satisfactory adjustment to prison life are outweighed by a history of violent crimes, just as the defense was entitled to argue the opposite. (*People* v. *McDowell, supra,* 46 Cal.3d at p. 571; *People* v. *Thompson, supra,* 45 Cal.3d at pp. 124-125.)

Defendant points to two passages in the prosecutor's argument referring to the impact of defendant's conduct on the victims of his crimes. In the first, the prosecutor recalled the testimony of defendant's family, who offered the view that he did not deserve the death penalty. He then referred to Van Zandt's mother, remarking that she likewise felt her son did not deserve the death penalty. In the second, the prosecutor recalled the victims of defendant's prior crimes—a 15-year-old girl defendant attempted to rape and a 61-year-old woman he kidnapped and robbed at knife point. He referred to the "anguish and emotional scars" the woman had suffered in the last year of her life following defendant's actions. Defendant claims that these passages in the prosecutor's argument violate *Booth* v. *Maryland, supra,* 482 U.S. 496, where extensive use of a victim impact statement showing the impact of the crime on the family of the immediate victim and others was held to violate the defendant's rights. (See also *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207] [*Booth* applied to prosecutor's final argument concentrating on laudatory character of victim as religious man and registered voter, as shown by his personal property found at the crime scene].)

Neither *Booth* v. *Maryland* nor *Gathers* v. *South Carolina* requires reversal here. Although the first comment does refer to Van Zandt's mother, it does not refer to her character or the specific impact of her son's homicide on her life, except to state the obvious: that her son was killed. In context, the comment was an attempt at *reductio ad absurdum*—the prosecutor was simply pointing out that relatives' natural feelings are inclined to leniency and should not be given substantial weight in a penalty determination. The second comment refers to the direct impact of defendant's prior crimes on the immediate victims, a matter we have held may be argued by the prosecution at the penalty phase. (*Karis, supra,* 46 Cal.3d at p. 641 & fn. 19; *Heishman, supra,* 45 Cal.3d at p. 195 [consideration of the impact of the crime on the immediate victim is relevant to the "moral assessment of facts" performed by the sentencing jury].) The brief mention of "anguish

and emotional scars" suffered by a 61-year-old victim defendant kidnapped and assaulted at knife point was no more than a permissible characterization of the crime. There was no misconduct. (*People* v. *Ghent, supra*, 43 Cal.3d at p. 772.)

In any event, the "fleeting and restrained" character of the prosecutor's comments rendered any error in permitting them harmless beyond a reasonable doubt. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 284-285 [266 Cal.Rptr. 834, 786 P.2d 892]; see also *People* v. *Malone* (1988) 47 Cal.3d 1, 38-39 [252 Cal.Rptr. 525, 762 P.2d 1249] ["brief and mild" reference to victim's family and personal feelings was not prejudicial misconduct].)

Defendant characterizes another portion of the prosecutor's argument as an attempt to turn an alleged mitigating factor (defendant's lack of capacity to conform his conduct to the requirements of the law) into an aggravating factor. In the same vein, he claims that the prosecutor disregarded uncontradicted defense expert testimony concerning defendant's mental state. Defendant distorts the prosecutor's argument. The prosecutor did not claim that defendant's mental capacity aggravated his crime; he merely challenged the testimony of defendant's experts and argued defendant's state of mind from the evidence. Because the jury was not bound to accept the views of defendant's experts, the prosecutor's argument was proper. (*People* v. *Crandell, supra*, 46 Cal.3d at p. 884; *People* v. *Drew* (1985) 22 Cal.3d 333, 350 [149 Cal.Rptr. 275, 583 P.2d 1318].) Again, there was no misconduct.

Defendant also finds fault with the prosecutor's statement that defendant was a "violent" person based on his record of violent crimes. This, too, was no more than a permissible comment supported by at least one reasonable view of the evidence. (*People* v. *Thompson, supra*, 45 Cal.3d 86 at p. 125.)[17]

Finally, defendant argues that the prosecutor attempted to turn his lack of remorse into an aggravating factor. The defense psychiatrist testified that defendant showed remorse. The prosecutor responded by pointing to defendant's letter to Barrett in which he stated that he had killed for her and would do so again. His comment was simply a response based on evidence in the record.

When the evidence and argument are considered in context, it is evident that defendant was not denied the effective assistance of counsel by any

---

[17] The prosecutor also referred obliquely to defendant's life in a "citizen-supported California institution" and "society's obligation to expend time and vast amounts of resources" on him in view of his record of violence. To the extent these references can be viewed as an improper comment on the costs of punishment (see *People* v. *Thompson, supra*, 45 Cal.3d at p. 132), any conceivable misimpression on the jury's part could have been cured by a timely objection and request for an instruction. None was made. In addition, such cryptic references in an otherwise restained argument did not deprive defendant of a fair trial.

failure to object to the prosecutor's comments during final argument. As we have noted, the argument contained little, if anything, that might be regarded as misconduct. Indeed, in light of the evidence, the prosecutor's argument was very restrained. Objections by defense counsel might well have invited adverse rulings, jury frustration or antagonism, and a more vigorous and pointed summation from the prosecutor. For tactical reasons, prudent defense counsel certainly could have concluded that silence was the best strategy. In sum, there was no misconduct or reversible error in the prosecutor's final argument or defense counsel's decision not to object to it.

XXVIII. *Consideration of Multiple Prior Felony Convictions Involving a Single Incident as Impermissible Aggravation*

In 1978, defendant was convicted of attempted rape and assault with intent to commit rape arising from his attack on a 15-year-old former girlfriend. Evidence of both convictions was introduced at the penalty phase. Defendant claims that because both convictions arose from the same incident, the jury's separate consideration of them resulted in an artificial and prejudicial inflation of the aggravating factors. Assuming error in this regard, we hold it was both harmless and waived by defendant.

First, defendant did not object to the consideration of these prior felony convictions on the ground he now asserts nor did he request a clarifying instruction that would have prevented any conceivable "artificial aggravation." In the absence of a timely objection, defendant waived any error. (*People* v. *Carrera, supra,* 49 Cal.3d 291, 341; *People* v. *Hamilton, supra,* 46 Cal.3d at p. 126; *People* v. *Siripongs* (1988) 45 Cal.3d 548, 583 [247 Cal.Rptr. 729, 754 P.2d 1306].)

Second, to the extent defendant implies that he was improperly convicted in the first instance of multiple offenses arising from a single incident (§ 654; *People* v. *Cole* (1982) 31 Cal.3d 568, 582 [183 Cal.Rptr. 350, 645 P.2d 1182]), we need not reach the merits of his argument. There was no prejudice to him in the introduction of those convictions at the penalty phase here. Because the underlying facts of the convictions at issue were presented in the penalty phase, the jury was aware that the two convictions stemmed from a single incident. Nothing in the prosecutor's argument or elsewhere in the record suggests that the jury weighed the mere number of convictions, as distinguished from the facts of the underlying incidents, improperly or inordinately. Indeed, the prosecutor expressly stated in final argument that he was relying on two prior convictions, referring to the separate kidnap and rape incidents. He did not attempt to enumerate defendant's convictions. Any error in introduction of the convictions was harmless.

### XXIX. *Failure to Modify CALJIC No. 8.84.1 to Preclude Arguable Overlapping and Artificial Inflation of Aggravating Factors*

 With respect to aggravating and mitigating factors, the jury was instructed using the language of CALJIC No. 8.84.1, which tracks the language of section 190.3 (all references in this part to factors are to this code section). Defendant contends the court erred in rejecting his request to modify the standard instruction. Specifically, defendant asked the court to delete the reference to the special circumstance in factor (a)[18] and to modify factor (b)[19] to state that the "criminal activity" referred to therein must be other than the conviction of the capital offense itself. The trial court did not err in refusing defendant's request.

With respect to factor (a), we have held that the trial court should, on request, admonish the jury not to consider multiple special circumstances *"more than once* for exactly the same purpose" in the penalty determination because it might otherwise double-count any "circumstances" of the capital crime which are also "special circumstances." (*People* v. *Melton, supra,* 44 Cal.3d at p. 768, italics in original.) Defendant, however, did not request an admonition in the form contemplated by *Melton.* (*Melton* had not yet been decided at the time of trial.) He asked instead that any reference to "special circumstances" in factor (a) be deleted entirely. Such a request carries the risk of the reverse problem—the jury might then believe it could consider only the circumstances of *"the* crime" (i.e., murder) and not those of the special circumstance (i.e., robbery-murder). This would defeat the manifest purpose of factor (a) to inform jurors that they should consider, as one factor, the totality of the circumstances involved in the criminal episode that is on trial. For this reason, the trial court did not err in refusing the proposed deletion.[20] Moreover, as we also observed in *Melton,* in the absence of any misleading argument by the prosecutor or an event showing a

---

[18] Factor (a) requires the sentencing jury to consider: "The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true."

[19] Factor (b) requires the sentencing jury to consider: "The presence or absence of criminal activity by defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

[20] Defendant points out that he also proposed a special instruction on aggravating factors which read as follows: "In deciding whether you should sentence the defendant to death or to life imprisonment without possibility of parole, you cannot consider as an aggravating factor any fact which was used by you in establishing the existence of any special circumstance which you have found to be true, unless that fact establishes something in addition to the existence of the special circumstance." The proposed instruction further illustrates the deficiency in defendant's argument. In addition to its vagueness and the resulting potential for juror confusion (what is "something in addition"?), the instruction effectively precludes consideration of even the basic facts and circumstances of the criminal activity which gave rise to the prosecution. It thus defeats the objective of factor (a).

substantial likelihood of double-counting, reversal is not called for. (44 Cal.3d at pp. 768-769.) No such argument or event was present here.

With respect to the proposed modification to factor (b), we have held that such an alteration of the statutory language is not required in the absence of misleading prosecutorial argument. (*People* v. *Siripongs, supra,* 45 Cal.3d at pp. 583-584 ["We cannot agree [that] such an instruction was required; in the absence of misleading prosecutorial argument to the contrary, and in view of the instruction as a whole, we believe a reasonable jury would have interpreted factor (b) as encompassing only violent criminal activity *other* than the capital offense." (Italics in original.)].) There was no such argument in this case, nor was there any other circumstance that would serve to mandate a change in the standard factor (b) instruction.

XXX. *Defendant's Requested Instruction That the Jury Consider Avette Barrett's and Allison Eckstrom's Plea Bargains as Mitigating Factors*

■ The trial court rejected defendant's request that the jury be instructed that the plea bargains with his two female accomplices be considered as a mitigating factor. But it did instruct the jury that mitigating factors were unlimited and that it could consider other, unenumerated facts or circumstances in mitigation. It also allowed defendant to argue that the disparity in treatment between defendant and his two accomplices justified the lesser sentence in his case.

We have repeatedly rejected the contention that capital juries must be directed to consider the relative severity of an accomplice's sentence as a mitigating factor. (*People* v. *Carrera, supra,* 49 Cal.3d 291 at p. 343 ["The punishment meted out to a codefendant is irrelevant to the decision the jury must make at the penalty phase: whether the defendant before [the court] should be sentenced to death."]; *People* v. *Malone, supra,* 47 Cal.3d 1, 54; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Dyer, supra,* 45 Cal.3d at pp. 69-71; *People* v. *McLain* (1988) 46 Cal.3d 97, 121 [249 Cal.Rptr. 630, 757 P.2d 569].) No error occurs in the omission of such an instruction.

XXXI. *The Instruction Allowing Consideration of Extreme Mental Distress and Substantial Domination as Mitigating Circumstances*

■ Defendant challenges the trial court's instruction following CALJIC No. 8.84.1 that the jury was to consider in mitigation "*extreme* mental or emotional disturbance" and "*substantial* domination" (italics added), arguing that its language precluded consideration of "non-extreme"

mental disorders and "less-than-substantial" domination as mitigating circumstances. We have rejected similar arguments on several occasions and perceive no reason to reconsider the issue. (*People* v. *Medina* (1990) 51 Cal.3d 870, 907-908 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1033 [258 Cal.Rptr. 821, 773 P.2d 172]; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 957 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Morales* (1989) 48 Cal.3d 527, 567-568 [257 Cal.Rptr. 64, 770 P.2d 244].) In addition, defendant was not prejudiced here because the jury was told that it was not limited in its consideration of mitigating factors, and defendant presented both evidence and argument as to his mental disorder. (48 Cal.3d at p. 568.)

## XXXII. *Omission of an Instruction Regarding Defendant's Failure to Testify at the Penalty Phase*

 As defendant concedes, we have previously rejected the contention that the trial court has a duty to instruct the jury sua sponte that it may not draw an adverse inference from defendant's failure to testify at the penalty phase. (*People* v. *Gates, supra,* 43 Cal.3d at pp. 1208-1209; *People* v. *Melton, supra,* 44 Cal.3d at pp. 757-758; *People* v. *Hamilton, supra,* 46 Cal.3d at p. 153.) Finding no reason to reconsider our prior decisions, we reject defendant's claim.

## XXXIII. *The Trial Court's Inquiry Into the Numerical Division of the Jury*

The jury began its penalty phase deliberation at 1:45 p.m. on July 15, 1987. It was released on that day at 4 p.m. It resumed deliberations at 9:05 a.m. the next day, broke for lunch at noon, and returned at 1:05 p.m. A half-hour later it sent a note containing two questions to the court. In the first question, it inquired as follows: "In the event this jury cannot decide 100% on the penalty phase of this case, what would be the [sentence] imposed?" The trial judge responded with a question of his own: "Without telling me exactly how the jury stands one way or the other, can you give me some idea . . . about the numerical count, how it might stand? Seven/five, six/six, four/eight?" The jury foreperson responded: "Approximately ten to two, Your Honor." The court then asked whether continued deliberations might result in a verdict and received an affirmative answer from the foreperson. It then declined to answer the question, referring jurors to the instructions previously given and admonishing them not to speculate on the consequences of their failure to agree on a verdict. The jury resumed deliberations and was released that day at 3:55 p.m. It returned the next day at 9 a.m. and reached its verdict at 10:46 a.m.

■ Defendant argues that the court's inquiry into the numerical division of the jury was an impermissible coercive tactic. We have previously rejected this argument. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 776 & fn. 14 [230 Cal.Rptr. 667, 726 P.2d 113] ["[A] neutral inquiry into numerical division, properly used, is an important tool in ascertaining the probability of agreement."].) By simply making the inquiry, the trial judge placed no pressure on the jury to reach a verdict and expressed no views as to the significance, if any, of its division. Thereafter, jury deliberation continued for some four additional hours over two days before the penalty verdict was reached. Defendant points to no evidence of undue pressure or influence on the jury resulting from the trial judge's remarks. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 535 [250 Cal.Rptr. 550, 758 P.2d 1081].) Accordingly, we decline his invitation to reverse the judgment.[21]

## XXXIV. *The Trial Court's Refusal to Inform the Jury of the Consequences of Its Failure to Reach a Penalty Verdict*

■ When asked by the jury what would happen if it failed to reach a penalty verdict (see factual description in pt. XXXIII, *ante*), the court declined to answer and admonished the jury not to speculate as to the consequences of its failure to agree. Defendant claims error, arguing that the court was obligated to explain what would happen in the circumstances posited by the jury. We have already rejected this contention. (*People* v. *Belmontes, supra,* 45 Cal.3d 744 at pp. 813-815; see also *People* v. *Allison* (1989) 48 Cal.3d 879, 908-909 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People* v. *Bell, supra,* 49 Cal.3d at pp. 552-553.) He offers no basis for reconsideration of our decisions, other than a reference to his separate argument about an erroneously typed jury instruction, which we consider below. Defendant has not justifed reversal on this ground.

## XXXV. *The Erroneously Typed Penalty Instruction*

Defendant submitted a special instruction No. 60, requesting that the jury be charged as follows: "If you have a reasonable doubt as to which penalty to impose, death or life in prison *without* the possibility of parole, you must give the defendant the benefit of that doubt and return a verdict fixing the penalty of life in prison *with* the possibility of parole." (Italics added.)

---

[21] The United States Supreme Court has articulated a different rule pursuant to its supervisorial power over the federal courts. Its rule is, however, not a matter of federal constitutional law and hence is not binding on us. (See *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 239-240 & fn. 3 [98 L.Ed.2d 568, 578-579, 108 S.Ct. 546, 552 & fn. 3].) Rather than a blanket rule of reversal for inquiry into the numerical division of the jury, no matter how benign its effect, we prefer a case-by-case approach which examines whether the inquiry resulted in impermissible coercion in the case at hand. As we have noted, there was no such coercion here.

The parties concede what is obvious on the face of the proposed instruction: the final clause contains a typographical error—the italicized word *"with"* should read *"without"* so that the penalties referred to are the same in both parts of the sentence, i.e., death or life in prison *without* the possibility of parole. Although the instruction was read to the jury in its correct form, i.e., the words "without possibility of parole" were included in both clauses, the typewritten version of the instruction taken into the jury room retained the error.

When the jury asked the court about the consequences of its failure to agree on a penalty verdict (see discussion in pt. XXXIII, *ante*), it also made a second request. It asked the court to "Please explain the noted page of instructions." Although the jury's note as it appears in the record contains no reference or attachment showing a page of instructions, the trial court stated on the record without objection by counsel that the jury was referring to the typewritten version of special instruction No. 60.

With the acquiescence of both sides, the court declined to explain the instruction, stating: "[T]he instruction itself is self-explanatory. And we would hope with that in mind, that you might be able to reach a decision." Neither counsel nor the court appears to have been aware of the error in the typed version of the instruction at the time of the jury's question. ▪▪ ▪ ▪ The mistake was discovered after the jury was discharged.[22]

▪▪ Defendant claims he was denied a fair trial because the jury, erroneously believing from the mistyped instruction that defendant could be released on parole, might have returned a death verdict rather than one it would have preferred, i.e., life imprisonment without any possibility of parole. In order to determine the likelihood that the jury was misled in the manner suggested by defendant, we must examine the mistyped instuction in light of the other instructions and in the context of defendant's trial as a whole. (*California* v. *Brown, supra,* 479 U.S. at p. 542 [93 L.Ed.2d at p.

---

[22] Although the requested instruction was prepared by defendant, its submission under these circumstances was not invited error. There was no evidence or indication in the record that defense counsel intentionally caused the error. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 931-932 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 334-335 [185 Cal.Rptr. 436, 650 P.2d 311].) Indeed, such a tactic would have been inconsistent with the defense strategy, clearly illustrated in final argument, of emphasizing the grim realities of life imprisonment without possibility of parole. The trial court made a specific finding that the error was inadvertent and not invited by defendant. We perceive no basis to disturb that finding. Therefore, we will consider whether the inadvertent error in the instruction deprived defendant of a fair trial. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 353 [253 Cal.Rptr. 199, 763 P.2d 1289] ["We may review the validity of an instruction initially requested by the defense where counsel's actions in seeking or not objecting to the instruction constitutes simply neglect or mistake. [Citations.]"].)

940]; *People* v. *Rivera* (1984) 162 Cal.App.3d 141, 145 [207 Cal.Rptr. 756]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 215-216 [260 Cal.Rptr. 583, 776 P.2d 285].)

In merely asking for an "explanation," the jury did not specify its concerns, if any, about the instruction. The reason for its inquiry may or may not have been the typographical error. No juror expressed on the record any belief or concern that defendant might receive parole. The generally phrased request for an explanation did not necessarily signify that jurors espoused any particular belief as to sentencing options. To the contrary, an examination of the entire record reveals that the jury was fully cognizant that there were only two available sentencing options—death and life imprisonment *without* possibility of parole—and that its solemn responsibility was to choose between them.

First, the language of the instruction and the verdict options suggest that the jury understood both the task at hand and its consequences. In the first part of the instruction, the two sentencing options were correctly stated as death and life imprisonment *without* possibility of parole. The jury was directed to give the defendant the benefit of any reasonable doubt it might have "as to which penalty to impose." Because of the typographical error, the balance of the instruction is both logically inconsistent and physically impossible. The inconsistency is patent: one cannot logically give defendant the benefit of a doubt arising between two specified penalties by imposing a third penalty that is obviously less severe than either of the first two.

The physical impossibility arises because the jury was given two verdict forms and was directed to return only one of them as its penalty verdict. One form stated: "We, the jury in the above-entitled cause, determine the appropriate penalty is LIFE IMPRISONMENT WITHOUT POSSIBILITY OF PAROLE and we so fix the punishment." (Emphasis in original.) The other contained identical language except that the specified penalty was "DEATH." (Emphasis in original.) Thus, the jury could not reasonably have understood the instruction as introducing the prospect of a third verdict— life with parole—as to which it had no directions, instructions, or verdict form. The jury's decision to return the "DEATH" form, properly signed and dated by the foreperson and attested to by all 12 jurors upon a poll, indicates that it had no reasonable doubt that death was the proper penalty to be imposed in defendant's case.

Second, from the beginning of the trial to its end, the sentencing options of death or life imprisonment *without* the possibility of parole were correctly and continually presented to the jury. In addition to individual voir dire, there were over 50 references to the sentencing options by the court and

counsel. In each case, the option of life imprisonment *without* any possibility of parole was correctly stated to the jury.

During individual voir dire, each prospective juror was asked whether he or she could consider the sentencing options of death and life imprisonment without possibility of parole. When the guilt phase began, the sentencing options were again correctly presented both in introductory instructions and in defense counsel's opening statement. At the penalty phase, two lawyers argued for defendant. Together they referred to life imprisonment *without* possibility of parole some 28 times.

The defense argument focused on the devastating reality that defendant would never leave prison if the jury did not sentence him to death. Counsel stated: "Let's take a look at the sentence of life imprisonment without the possibility of parole. That sentence means exactly what it says. His Honor, Judge Giffen, will instruct you on that." He then graphically illustrated the prospect of a life without any possibility of freedom. Positing a series of decades—1990, 2000, 2010, 2020—he gave his own age and that of his children at the beginning of each decade and reminded the jury that defendant would still be in prison. He observed that defendant would receive a more severe sentence than Charles Manson or Sirhan Sirhan who, in contrast to defendant, were sentenced to life imprisonment *with* possibility of parole. He invited the jury to empathize with defendant who, regardless of the jury's verdict, would die in prison after spending the remainder of his life in a cell less than half the size of the jury box. The refrain was repeated again and again to dramatize the severity of the punishment defendant would inevitably receive even if the jury did not sentence him to death.

The penalty phase instructions mentioned life imprisonment without possibility of parole 11 times, stating it correctly each time. For example, the trial judge not only informed the jury of its sentencing options and their effects, it admonished jurors to consider no other possibilities: "You are instructed that life without parole, that verdict, means exactly what it says. That the defendant shall be imprisoned for the rest of his life. And you are instructed that a death verdict means exactly what it says. That the defendant will be executed. *For you to conclude otherwise would be to rely upon speculation or conjecture and would be a violation of your oath as a juror.*" (Italics added.) And: "It is the law of this state that the penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life *without* possibility of parole in any case in which the special circumstance charged in this case has been specially found to be true." (Italics added.) And again: "The choice you make is not simply between good and bad, but between the punishment of life imprisonment *without* possibility of parole and death." (Italics added.) And

finally: "To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life *without* parole." (Italics added.)

Thus, in all of the references to the possible penalties in this case by the court and counsel, only one—the mistyped instruction—incorrectly refers to life in prison *with* possibility of parole. Even that instruction stated the two alternative penalties correctly in its opening clause. There is no reasonable possibility that the jury ignored all 50 of these references in favor of a single exception which, as we have noted, was both an illogical and impossible verdict.

Third, even the challenged instruction was correctly *read* to the jury, the error remained only on the typewritten copy. The jury was instructed that the text of the instructions *as read to it* controlled over delineations or modifications in any written copies of instructions it might request. As discussed above, all of the instructions read to the jury were correct and consistent as to the only two sentencing options.

Focusing on the specific language of the erroneous instruction as a reasonable juror would and considering the context of defendant's trial (*California* v. *Brown, supra,* 479 U.S. at p. 541 [93 L.Ed.2d at pp. 939-940]), we conclude that there was no "reasonable likelihood" the jury inferred that defendant might receive parole if he were not sentenced to death. (*Boyde* v. *California, supra,* 494 U.S. at p. __ [108 L.Ed.2d at pp. 329-330, 110 S.Ct. at p. 1198].)

To bolster his claim of prejudice, defendant relies on the affidavit of a single juror presented to the trial court on his motion for new trial. The affiant reports his own confusion as to the instruction, but adds that two other jurors expressed the view that the reference to life with parole was a mistake.

At the outset, defendant's reliance on the affidavit is misplaced. "[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror 'felt' or how he understood the trial court's instructions is not competent." (*People* v. *Sutter* (1982) 134 Cal.App.3d 806, 819 [184 Cal.Rptr. 829]; see also Evid. Code, § 1150; *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 575-578 [224 Cal.Rptr. 664, 715 P.2d 624] (Mosk, J., conc.); *Tanner* v. *United States* (1987) 483 U.S. 107, 116-127 [97 L.Ed.2d 90, 103-110, 107 S.Ct. 2739].) The affidavit relied on by defendant refers principally to the mental processes of the jury, i.e., its understanding or lack of understanding of the

sentencing options available to it under the instructions given by the court. To this extent, the affidavit contains inadmissible matter and should have been disregarded by the trial court.

But even if the juror affidavit is considered, it does not provide convincing support for defendant's argument. The juror who signed the affidavit was highly equivocal. He reported some personal confusion about the instruction, but concluded only that clarification *might* have caused him to change his vote. As noted above, he admitted that two other jurors correctly discerned the error in the instruction and pointed it out to their colleagues. The balance of the affidavit reiterates events already apparent from the record, e.g., that jury stood ten to two for death at the time the clarification was sought and, after four hours of additional deliberation over two days, reached a unanimous verdict. It says nothing that would permit an inference that any vote change or the final verdict was probably attributable to the typographical error. Thus, even if the affidavit were admissible, it does not provide substantial support for defendant's argument that the penalty phase verdict was based on a misconception as to sentencing options. By denying the motion for new trial, the trial court effectively discounted the affidavit. We will do likewise.

Although this particular defendant was not prejudiced by the erroneously typed instruction, we admonish trial lawyers and judges to take special care to avoid this kind of potentially serious mistake. First, typewritten instructions sent to the jury room should be checked and proofread carefully by counsel and the court. Second, when a jury requests an explanation of an instruction, the trial judge should ascertain the precise nature of the inquiry before simply referring the jury to the charge as given. If these procedures had been followed here, the typing mistake would undoubtedly have been detected at an earlier stage.

For the reasons stated above, the typographical error in defendant's requested instruction did not deprive him of a fair trial at the penalty phase.

XXXVI. *Cumulative Effect of Errors and Harmless Error at the Penalty Phase*

■ For the reasons discussed above, we also reject defendant's contention that the cumulative effect of asserted penalty phase errors requires reversal of his sentence. We have rejected nearly all of defendant's assignments of error. Where error was present, it was nonprejudicial. The evidence and argument at the penalty phase were properly focused on the defendant and his crimes as well as potentially mitigating factors; substantial and credible evidence supported the jury's selection of the death penal-

ty; the jury was correctly instructed on the law; and no event or occurrence deprived defendant of a fair trial.

To the extent there was any error in the penalty phase, it was harmless beyond a reasonable doubt. The heinous nature of defendant's crime and his prior criminal convictions for violent acts have convinced us that the verdict would not have been otherwise even in an error-free trial. (*People* v. *Turner, supra,* 50 Cal.3d at p. 714; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1184-1185 [259 Cal.Rptr. 701, 774 P.2d 730].)

XXXVII. *The Trial Court's Ruling on the Motion for Modification of Defendant's Death Sentence*

■ Defendant challenges the trial court's rejection of his statutory motion to modify the sentence under section 190.4, subdivision (e), arguing the court failed to exercise independent judgment, considered irrelevant factors, and improperly weighed the specified factors in reaching its decision. The record does not support the challenge.

In ruling on the motion, the trial court summarized the penalty phase evidence and stated: "[T]he sentencing function is inherently a moral and normative one. The sentencing court's power and discretion under the legislative guidelines is to decide the appropriate penalty for the particular offense and offender under all the relative circumstances." The court's remarks reflect the exercise of independent judgment.

Similarly, there is no indication that the trial court gave undue emphasis to any of the factors it analyzed.[23] Nor did the court seek to convert the absence of mitigation into aggravation.[24] There was no error in its

---

[23] There is no merit in defendant's suggestions that the trial court somehow "double counted" his robbery-murder of Van Zandt in considering aggravating circumstances or that it disregarded evidence of his mental condition. As to the first suggestion, the court did no more than comment on the circumstances of the crime, an acknowledged aggravating factor. (§ 190.3, factor (a).) It did nothing to intimate that it was mechanically counting mitigating and aggravating factors. As to the second suggestion, the court stated that it was considering defendant's childhood and mental condition, although it found that defendant did not suffer from an extreme mental or emotional disturbance. (§ 190.3, factor (d).) The trial court was entitled to weigh the credibility of the evidence relating to defendant's background and mental condition and to balance this against other relevant factors. (See, e.g., *People* v. *Morales, supra,* 48 Cal.3d 527, 572-573.) It committed no error.

[24] Defendant also faults the court for converting the absence of any moral justification or extenuation for defendant's conduct (§ 190.3, factor (f)) into an aggravating circumstance. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, fn. 15 [245 Cal.Rptr. 185, 750 P.2d 1342].) He ignores the context of its remarks. The trial court observed that the victim did not participate in the conduct that led to his death and that there was no moral justification or extenuation for defendant's conduct. It then concluded that the absence of this factor (factor (f)) *and* the fact that the crime was committed "out of total disregard for the personal property and the

disposition of the motion to modify sentence. (*People* v. *Malone, supra,* 47 Cal.3d 1, 58; *People* v. *Silva* (1988) 45 Cal.3d 604, 632 [247 Cal.Rptr. 573, 754 P.2d 1070].)

## XXXVIII. *Constitutionality of the 1978 Death Penalty Law*

Defendant raises a series of challenges to the 1978 death penalty law which we have previously rejected. (*People* v. *Medina, supra,* 51 Cal.3d 870, 911; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1285.) The United States Supreme Court has also upheld the 1978 law. (*Boyde* v. *California, supra,* 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *California* v. *Brown, supra,* 479 U.S. 538.) We therefore reject defendant's challenges.

## XXXIX. *Alleged Arbitrariness, Discrimination, and Disproportionality in Defendant's Death Sentence*

Finally, defendant maintains that his sentence is disproportionate to the penalties imposed on the other "principals" in this case, disproportionate to the circumstances of the crime in light of defendant's character and background, and unconstitutional because of the infrequency of the penalty in single-victim robbery-murder cases. Defendant maintains that "comparative sentence review" is necessary to determine the proportionality of defendant's sentence.

Initially, defendant is not entitled to comparative intercase review of his sentence, whether based on statistics or on an examination of those cases in which arguably more serious murders received lesser sentences. (*McCleskey* v. *Kemp* (1987) 481 U.S. 279 [95 L.Ed.2d 262, 107 S.Ct. 1756]; *Pulley* v. *Harris* (1984) 465 U.S. 37, 42-43 & fn. 5 [79 L.Ed.2d 29, 35, 104 S.Ct. 871].)

We have, however, examined the individual circumstances of the offense and the offender in reviewing capital sentences. (*In re Lynch* (1972) 8 Cal.3d 410, 424-429 [105 Cal.Rptr. 217, 503 P.2d 921]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-489 [194 Cal.Rptr. 390, 668 P.2d 697]; see also *People* v. *Babbitt* (1988) 45 Cal.3d 660, 726 [248 Cal.Rptr. 69, 755 P.2d

---

personal well-being of the victim" amounted to a factor in aggravation. Read in context, the court's remarks convey two distinct messages: first, there was no justification for this crime and therefore no mitigating factor arising from the manner of its commission; second, the surrounding circumstances of the crime showed a callous indifference to life and property that aggravated its commission. The circumstances of the crime are a permissible factor in aggravation (§ 190.3, factor (a)). Although the trial court might have chosen its words more carefully, its use of those circumstances in its evaluation is amply supported by the evidence. Again, there was no error. (*People* v. *Coleman, supra,* 48 Cal.3d at p. 159.)

253].) Such an examination affords defendant no relief. His crime was a heinous and brutal one. After the victim had gone out of his way to help defendant and his companions, defendant viciously attacked and killed him in order to steal his van. He repeatedly struck a defenseless victim over the head with a rock; rolled him down an embankment; and then hit him again with a stick when he tried to get up. There was no conceivable provocation for the offense. Defendant boasted about his crime to at least three people and said he would do it again. He has a prior record of kidnapping and attempted rape. ██ ██ ██ ██ Under all of the circumstances, there is nothing arbitrary or unfair about the imposition of the death penalty.[25]

### DISPOSITION

For the reasons stated above, there was no prejudicial error in the proceedings below. We affirm the judgment of death in its entirety.

Panelli, J., Kennard, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I dissent.

Defendant's trial was rife with error, under the United States Constitution as well as state law, bearing on both the issue of guilt and that of penalty.

The majority acknowledge a number of violations. Among the most serious was the typewritten instruction at the penalty phase that directed the jury to impose life imprisonment *with* possibility of parole if it had a reasonable doubt as to the appropriate punishment. Despite the majority's efforts at rationalization, this error may well have been a factor in the jury's ultimate decision. Certainly, the jurors—who revealed that they were divided on penalty—were altogether perplexed. Both of their questions to the court asked for an explanation of the instruction—the first impliedly and the second expressly. Not only did the court give no assistance, it

---

[25] We decline defendant's invitation to undertake a review of his sentence by comparing it to the plea bargains received by his two female companions. The exercise of prosecutorial discretion in obtaining evidence and making charging decisions is not pertinent to a review of a capital sentence. (*Adcox, supra,* 47 Cal.3d at pp. 238-239; *Belmontes, supra,* 45 Cal.3d at pp. 778, 818-819; *People* v. *McLain, supra,* 46 Cal.3d 97, 121.) But even if we were to make the comparison sought by defendant, it would afford him no benefit. The fact that Avette Barrett was allowed to plead guilty to an automobile theft (her sentence is not shown in the record) and that charges were dropped against Allison Eckstrom does not change the nature of the offense or the offender in this case. Defendant did the bulk of the planning and all of the killing. The women struck no blows. Their significantly lesser participation in the charged crimes and other factors such as age differences justify a difference in treatment. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 540 [268 Cal.Rptr. 126, 788 P.2d 640].)

insisted the instruction was "self-explanatory." The result was a self-explanatory error.

I find other violations in addition. For example, the accomplice instructions at the guilt phase were improper. Defendant's defense was nonparticipation—specifically, that it was not he who perpetrated the crimes, but rather his companions Avette Barrett and Allison Eckstrom. The accomplice instructions unfairly undermined the defense. They told the jury that Barrett and Eckstrom were aiders and abetters as a matter of law—and thereby necessarily implied that defendant was, in fact, the perpetrator.

In my view, reversal is required. In arriving at the opposite conclusion, the majority state that even when considered together, the numerous errors are nonprejudicial under the standard of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Under that test, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at pp. 710-711].) The "burden of proof" as to prejudice rests on the People. "Certainly error, constitutional error, . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless . . . . [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.* [17 L.Ed.2d at p. 710].)

On this record, I simply cannot declare a belief that the numerous errors at defendant's trial were harmless *beyond a reasonable doubt*. The People have not carried their burden of proving, to that high degree of certainty, that the violations did not contribute to the result. That does not surprise. Some of the defects—such as the instructional improprieties noted above—went to the very heart of the jury's determination of guilt and penalty. It is arguable, to be sure, that the errors were harmless under some more tolerant standard. But such a test does not apply here.

No doubt the principled application of harmless-error analysis is often a difficult task. It calls on a reviewing court to resolve the elusive question of prejudice. It also requires individual judges who may be personally satisfied with the outcome of a trial to set that result aside for what may appear to be somewhat abstract reasons implicating the integrity of the legal system as a whole.

Regrettably, in order to salvage judgments of death that have been tainted by error, this court has often failed in this task in recent years. (See, e.g., *People* v. *Wright* (1990) 52 Cal.3d 367 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Whitt* (1990) 51 Cal.3d 620 [274 Cal.Rptr. 252, 798 P.2d 849];

*People* v. *Bell* (1989) 49 Cal.3d 502 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Sheldon* (1989) 48 Cal.3d 935 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Allison* (1989) 48 Cal.3d 879 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People* v. *Robertson* (1989) 48 Cal.3d 18 [255 Cal.Rptr. 631, 767 P.2d 1109].)

In order to find that an error at trial was harmless beyond a reasonable doubt, an appellate court must obviously review the record as a whole under what has generally been termed "the totality of the circumstances." This point is the subject of a thoughtful analysis by Justice Antonin Scalia in an article entitled *The Rule of Law as a Law of Rules* (1989) 56 U.Chi.L.Rev. 1175. He cogently declares that "we should recognize that, at the point where an appellate judge says that . . . [an] issue must be decided on the basis of the totality of the circumstances, or by a balancing of all the factors involved, he begins to resemble a finder of fact more than a determiner of law." (*Id.* at p. 1182.) He adds that "To adopt such an approach . . . is effectively to conclude that uniformity is not a particularly important objective . . . ." (*Id.* at p. 1179.) To the contrary, achieving uniformity in the law, and properly monitoring the conduct of trial courts, are the functions of this appellate court, the only court that reviews capital cases.

Because I cannot conclude that the numerous errors at both the guilt and penalty phases of defendant's trial were harmless beyond a reasonable doubt, I would reverse the judgment in its entirety.

**BROUSSARD, J.,** Dissenting.—I agree with Justice Mosk that defendant's trial was fraught with error and is incapable of supporting the judgments on either guilt or penalty. I write separately, however, to emphasize the prejudicial nature of two errors—one at the guilt phase and one at the penalty phase—that prevented defendant from receiving a fair trial.

## I.

Defendant's entire defense rested on the theory that Barrett, not he, had killed the victim. The testimony of Barrett and of her sister Eckstrom that defendant, rather than either of them, had committed the murder was perhaps the most significant testimony that was presented in support of the prosecution's case. In return for their testimony, the sisters were both offered immunity from prosecution for crimes associated with the victim's murder. Defendant contends that, in light of the conditions under which the sisters were granted immunity, their testimony should not have been admitted at trial and that the erroneous admission of the testimony was prejudicial.

The governing legal principles are well established by our past cases. As we explained in *People* v. *Garrison* (1989) 47 Cal.3d 746, 768-769 [254

Cal.Rptr. 257, 765 P.2d 419]: "A prosecutor may grant immunity to one jointly charged with a crime upon the condition that he or she testify fully and fairly as to the facts involved. (*People* v. *Green* (1951) 102 Cal.App.2d 831, 838-839 [228 P.2d 867].) When the grant of immunity places the witness under strong compulsion to testify in a particular fashion, however, the testimony is tainted by the witness's self-interest and is inadmissible. (*People* v. *Medina* [(1974)] 41 Cal.App.3d [438,] 455 [116 Cal.Rptr. 133].) . . . [¶] . . . 'What is improper . . . is not that what is expected from the informant's testimony . . . will be favorable to the People's case, but that the testimony must be confined to a predetermined formulation or rendered acceptable only if it produces a given result, that is to say a conviction.' [Citation.]"

Defendant's case relied entirely on his and others' assertions that Barrett killed the victim. The agreements entered into by Barrett and Eckstrom were expressly conditioned upon the truth of the representation of each of the sisters "that she did not personally inflict any injuries upon [the victim]." The agreements also provided that each of the women would testify "completely and truthfully at all proceedings including preliminary examination and trial concerning all of the facts and circumstances surrounding the killing [of the victim]." In return for offering this testimony, "the prosecutor [agreed to] move to dismiss all charges pending against Avette Barrett with the exception of [felony auto theft]"; Eckstrom was not even subject to prosecution for auto theft. Under these circumstances, it is beyond question that the initial condition in the immunity agreements was improper.

The agreements were signed the day the preliminary examinations began, January 21, 1986. Though not mentioned in the majority opinion, both Barrett and Eckstrom testified under oath at the preliminary examination. Upon taking the stand both Barrett and Eckstrom were reminded by the court of their obligations under the immunity agreements; at one point after Barrett paused in response to several questions incriminating defendant, the court took a five-minute recess during which time the judge suggested to the prosecutor, "maybe you'll want to go over the terms of that [immunity] agreement with her." Thus both Barrett and Eckstrom were well aware of the terms and conditions of their respective immunity agreements. Both sisters testified at the preliminary examination that defendant, and not they, had killed the victim.

On May 26, 1987—the 30th day of trial and shortly before Barrett was called to testify—the prosecutor amended Barrett's immunity agreement: "Amendment to plea agreement on 5-26-87. I, Gary Rossi, Special Prosecutor for Sierra County, agree to amend the plea agreement dated 1-21-86 to strike condition number one [regarding the representation that

Barrett did not physically injure victim]. This was done to guarantee [defendant] a fair trial." The special prosecutor recognized that the immunity agreement of January 1986 was improper and threatened to compromise defendant's access to a fair trial.

The majority hold that the special prosecutor's amendment of the immunity agreement was sufficient to cure any potential error in the agreement: "Barrett's testimony was admissible because the only condition remaining at the time of trial was that she testify completely and truthfully." (Maj. opn., *ante*, at p. 191.) Because "corroborating circumstances" existed, largely in the form of Barrett's testimony, they further hold that the admission of Eckstrom's testimony was not prejudicial despite the fact that the original condition of the immunity agreement was never removed. (*Id.* at pp. 191-192.) The majority are wrong. Neither of the sisters' testimony should have been admitted.

Barrett testified extensively and articulately during the preliminary examination: she claimed that she and Eckstrom had encouraged defendant to "knock out" the victim so that they could steal his van, testified at length about the circumstances leading up to the victim's murder, and described in graphic detail the incidents of the murder, e.g., that the sound of defendant hitting the victim was "like him hitting . . . like a watermelon, a cantaloupe." Eckstrom's testimony was similar.

The majority assert that because no unacceptable restrictions remained on Barrett when she testified *at trial*, she was therefore able to testify freely, and that such testimony would not be tainted by the original immunity agreement in place at the time of her preliminary examination testimony. This assertion is insupportable. In purporting to release Barrett from the unacceptable initial condition of her immunity agreement, the special prosecutor did not offer Barrett immunity from prosecution for perjury should her testimony at trial differ materially from that offered at the preliminary examination. Neither did the special prosecutor offer to amend the condition of Barrett's immunity agreement that required her to testify completely and truthfully at the preliminary examination as well as at trial.

The import of the special prosecutor's failure to take these corrective actions is obvious. In reality, Barrett was not free to testify truthfully at trial but was only free to testify in a manner consistent with her preliminary examination testimony, which was clearly tainted by the invalid initial condition. If her trial testimony conflicted with her preliminary examination testimony, Barrett would have been liable for prosecution for perjuring herself with respect to at least one of the proceedings. Furthermore, and most significantly, if her trial testimony conflicted with her preliminary

examination testimony, Barrett would also have been liable for prosecution for the victim's murder since, even after the midtrial amendment, the immunity agreement continued to be conditioned upon Barrett's promise to testify completely and truthfully at *both* the preliminary examination and trial. If she had testified inconsistently at trial, the prosecutor could clearly revoke the immunity agreement on the ground that she had failed to testify truthfully at either the preliminary hearing or the trial.

Thus, contrary to the majority's assertion, the prosecutor's belated amendment of the immunity agreement did not cure the agreement of its impermissibly coercive feature and, despite the revision, Barrett was placed under "such a strong compulsion to testify in a particular fashion as to deny defendant a fair trial." (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1255 [232 Cal.Rptr. 849, 729 P.2d 115].)

Nor can I agree with the majority's argument that Eckstrom's testimony was not prejudicial. The immunity agreement entered into by Eckstrom prior to the preliminary examination remained in force throughout the trial. In view of my conclusion that Barrett's testimony should have been excluded from evidence, I cannot join in the majority's assertion that the admission of Eckstrom's testimony did not deny the defendant a fair trial. Indeed, as Eckstrom was the only witness to the murder other than defendant, and as her testimony flatly rejected defendant's version of the facts, I conclude that there were insufficient "corroborating circumstances" supporting Eckstrom's testimony to render its admission into evidence harmless.

It is beyond my comprehension that the majority can so blithely conclude that there was no error as to Barrett and no prejudice as to Eckstrom without a full disclosure of these facts and with virtually no analysis of the substantial legal issues presented by the immunity agreements. As the majority opinion demonstrates, the law in this area is reasonably well settled. Yet a summary examination of this record discloses facts that cannot be easily squared with the majority's discussion of the law. After carefully weighing those facts, I conclude that the immunity agreements entered into by both Barrett and Eckstrom were improper and that the effect of the agreements was prejudicial.

## II.

On July 15, 1987, the jury retired to consider the evidence presented during the penalty phase of defendant's trial. The jury received, in writing, special instruction No. 60, which read in pertinent part: "If you have a reasonable doubt as to which penalty to impose, death or life without the possibility of parole, you must give the defendant the benefit of the doubt

and return a verdict fixing the penalty of life in prison *with* the possibility of parole." (Italics added.) As the majority acknowledge, this was error. Life *with* parole was not available to defendant.

After nearly six hours of deliberations, the jury submitted two questions to the court. The first asked: "In the event this jury cannot decide 100 % on the penalty phase of this case what would be the sentence [*sic*] imposed?" The second asked that the court "[p]lease explain the noted page of instructions." The noted page referred to special instruction No. 60, with its erroneous reference to life with parole.

These facts indicate that the jurors in this case foresaw a possible deadlock and were concerned about the consequences of such a deadlock. Indeed, at the time the jury submitted its questions to the jury, the jurors were split, 10 to 2, on the appropriate penalty to impose upon defendant. The jury was evidently unaware that a deadlock would lead to a retrial of the penalty phase before another jury, and may have believed that the law prescribed a specific sentence to be imposed by the court in lieu of a jury determination. Further, the jury was apparently also confused as to the alternative sentences available to it, since it asked for an explanation of special instruction No. 60.

The court's responses to the jury's questions did nothing to dispel the jury's misconceptions. To the first, it properly responded that "[t]he statutes provide for what happens in the event that you folks aren't able to reach a decision, but I can't tell you what that is at this point in time." Yet as to the mistyped instruction informing the jury that under certain conditions it must return a verdict fixing the penalty of life in prison *with* the possibility of parole, the court did not respond properly; it neither discovered nor corrected the error. Instead, the court told the jury that "the instruction itself is self-explanatory. And we hope with that in mind, that you might be able to reach a decision."

The majority concede that the instruction was erroneous. The opinion concludes, however, that the mistyped instruction can be dismissed as a harmless typographical error, since the jury must have realized from other instructions and numerous comments during the trial that there were only two possible penalties, death and life without parole, that the jury should consider.

The majority misapply the harmless error test. In reviewing the penalty phase in a death penalty case, the harmless error standard requires that we inquire into "whether there is a 'reasonable possibility' [that the] error affected a verdict." (*People* v. *Brown* (1988) 46 Cal.3d 432, 447 [250

Cal.Rptr. 604, 758 P.2d 1135].) In determining whether a juror has based his vote on improper considerations, we must inquire in all cases into "whether the instructions tend to impose such pressure on jurors to reach a verdict that we are uncertain of the accuracy and integrity of the jury's stated conclusion. This determination of whether the instructions 'operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency' is perhaps best characterized as requiring a generalized assessment of the potential effect of a given instruction on the fact finding process, rather than as an attempted inquiry into the actual volitional quality of a particular jury verdict." (*People* v. *Gainer* (1977) 19 Cal.3d 835, 850 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73], citation omitted.) I believe that, absent the instructional error, there is a reasonable possibility that the jury would not have arrived at a unanimous opinion.

Incredibly, the majority assert that the jury was not confused by special instruction No. 60: "[A]n examination of the entire record reveals that the jury was fully cognizant that there were only two available sentencing options—death and life imprisonment *without* the possibility of parole—and that its solemn responsibility was to choose between them." (Maj. opn., *ante*, at p. 229, italics in original.) But the jury obviously was confused about the special instruction's reference to life *with* the possibility of parole since it specifically brought special instruction No. 60 to the court's attention for further explanation. The jury's confusion about the special instruction was not dispelled by the court. Instead, by stating that the instruction was "self-explanatory," *the court assured the jury that the special instruction No. 60 was correct.*

A fundamental assumption that underlies our entire judicial system is that the jurors follow the court's instructions. (See *Delli Paoli* v. *United States* (1957) 352 U.S. 232, 242 [1 L.Ed.2d 278, 285-286, 77 S.Ct. 294], overruled on other grounds in *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Bonin* (1988) 46 Cal.3d 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217].) Particularly when the jury has specifically focused upon an erroneous instruction, it is improper simply to assume, as the majority opinion does, that the jury was not affected by the error. Indeed, when the court proceeds to affirm an erroneous instruction, even though the jury brings the instruction to the court's attention, we must recognize the possibility—indeed, the likelihood—that the jury concluded that it had a duty to accept the instruction as it was written and reject any conflicting views.

In this case, the import of special instruction No. 60, as it was submitted to the jury, was ambiguous. Yet it was prejudicial however the instruction was interpreted. Individual jurors who were in doubt about the penalty to

impose—death or life without parole—may have been led into voting for death on the belief that if they adhered to their doubt, the law required them to vote for life *with* the possibility of parole. Alternatively, the instruction could have been interpreted to mean that if "doubt" existed because the jurors could not unanimously agree on a verdict—i.e., if the jury deadlocked—then the jury as a whole was required to return a verdict of life with the possibility of parole. Thus the jury would be effectively coerced into unanimity if the dissenting jurors could not countenance allowing defendant the prospect of parole. However illogical either interpretation may appear to persons who are familiar with the workings of the law, either is a plausible interpretation of the instruction that the court submitted to the jury and, upon the jury's inquiry, directed that the jury follow.

Furthermore, the majority fail to see the potential connection between the erroneous instruction and the jury's simultaneous inquiry with regard to the consequences of a jury deadlock. The jury did not need to interpret the special instruction literally in order to prejudice defendant. As noted, the jurors were obviously concerned about the effect of a deadlock on defendant's future; one or more jurors may have feared, in light of the erroneous instruction, that if the jury was unable to arrive at a unanimous decision the court might be required, by the unspecified statute to which the court referred, to sentence defendant to life imprisonment with the possibility of parole. In my view, this is a plausible, perhaps even a likely, explanation of why the jury asked what sentence would be imposed in the event of a deadlock *and* for an explanation of special instruction No. 60.

The test for harmless error at the penalty phase of a death penalty case precludes us from affirming a death penalty whenever there is a reasonable possibility that an error may have affected the jury's verdict. In light of the literal meaning of special instruction No. 60 and the court's statement that the instruction was self-explanatory, I conclude that a reasonable possibility exists that the mistyped instruction operated "to displace the independent judgment of the jury in favor of considerations of compromise and expediency" (*People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353]) and improperly led one or more jurors to rule in favor of death as a result of a misunderstanding of the law.

I would reverse the judgment as to penalty.

### III.

It is frequently observed that there is no such thing as a trial without error. In this case, however, the errors were egregious and their effect

prejudicial. I must therefore dissent from the entirety of the majority's opinion.

Appellant's petition for a rehearing was denied May 22, 1991. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.